[Civ. No. 13919. Second Dist., Div. Three. Jan. 18, 1944.]

JOHN HANCOCK MUTUAL LIFE INSURANCE COMPANY (a Corporation), Respondent, v. JOSEPH MARKOWITZ, Appellant.

Arthur Rosenblum and Harold D. Geffen for Appellant.

Meserve, Mumper & Hughes for Respondent.

DESMOND, P. J.—This case presents an appeal from a judgment in favor of plaintiff insurance company and also an attempted appeal from a decision of the court, erroneously denominated a judgment, rendered in a proceeding upon a special defense under section 597 of the Code of Civil Procedure, holding that the action in chief, immediately hereinafter mentioned, was not barred by the statute of limitations, section 338, subdivision 4, Code of Civil Procedure. The judgment appealed from was rendered in the action which plaintiff filed after sending the following letter, dated November 20, 1933, to the defendant:

"Dear Sir:                    In re: Policies #1329930-1334357
                                      Joseph Markowitz

"The Company duly received your letter of November 6th in reference to your claim for disability benefits under the above numbered policies.

"The disability clauses in these policies provide that benefits are payable for total and permanent disability caused by bodily injury or disease sustained or contracted after the dates of issue of the policies.

"These policies were issued August, 5th and 18th, 1926, respectively, and the Company has paid you disability benefits thereunder since April 28, 1927, upon the assumption that the claim which you presented therefor was based upon a disease which was contracted subsequent to the aforesaid dates.

"The Company has just received evidence that clearly indicates that the disease causing your disability, namely,

tuberculosis, was contracted prior to the dates of issue of these policies, and that you were suffering from that disease as far back as 1924, nearly three years prior to the inception of the payment of these benefits.

"Upon this evidence it is plain that, notwithstanding the incontestable clause in these policies, they by their express terms exclude and do not cover this claim, so that you were not entitled to the benefits which have been paid to you amounting to about $7600, or to the waiver of the premiums which was granted for the past six or more years.

"This is to inform you that since you were not entitled to a waiver of the aforesaid premiums, the Company considers that these policies lapsed as of the date of the last payment by you of the premiums thereon, and that said policies are void and out of benefit except for any nonforfeiture value accruing thereon in accordance with their terms, and that the Company disclaims all liability for your claim for any disability benefits under these policies, that it will not pay any further benefits to you on account thereof and that unless the full amount paid to you is immediately refunded, it will start legal action against you to recover that amount, for the payment of which the Company hereby makes demand upon you.

"The Company in writing this letter does not in any way waive any of its legal rights in connection with any matter pertaining to these policies or your claim thereunder for disability benefits, and it does not in any way waive any right to raise any other matter in defense to your claim that is not specifically mentioned in this letter, but, on the contrary, expressly reserves and retains all of its rights and defenses.

Very truly yours,
Harold J. Taylor,
Associate Counsel."

The judgment rendered in this action by Honorable Charles S. Burnell decreed "That any alleged disease from which defendant has heretofore or does now claim to be suffering and which defendant claims has caused or is now causing him to be wholly and permanently disabled, was contracted prior to the date of issuance of both of the policies involved' in the within entitled action, and such disability, if any, was not and is not a disability insured against in said policies, and was a risk not assumed under said policies of insurance,

and plaintiff company never has been and is not now liable for or required to pay to defendant any disability benefits or to waive the payment of any premiums under the terms and conditions of said policies, or either of them.'' The court ordered that plaintiff should have and recover from defendant the sum of $7,600 theretofore paid him as disability benefits as well as interest accrued from the dates of such payments in the sum of $6,212.50, and decreed that both policies mentioned in the company's letter had lapsed for nonpayment of premiums upon the first anniversary of issuance and ''that since said dates, respectively, said policies, and each of them, have been and are now of no further force or effect and that defendant be, and he is, hereby directed to deliver up to plaintiff the said policies, and each of them, for cancellation.'' The court, by its judgment, also decreed ''that defendant and cross-complainant is not entitled to any recovery, relief or judgment in the within entitled action by reason of his cross-complaint or otherwise.''

Each policy had been written on the life of defendant for $5,000, in favor of his wife, and contained a proviso under a special clause entitled ''Total and Permanent Disability Benefit Provision,'' reading as follows:

''1. If after the first premium or regular instalment thereof shall have been paid hereunder and under the policy, the Insured prior to the anniversary of the policy nearest his sixtieth birthday shall become wholly and permanently disabled by bodily injury or disease sustained or contracted after the date hereof, so that thereby he will be wholly, continuously and permanently prevented from the pursuit of any form of mental or manual labor for compensation, gain or profit whatsoever, then, if there is no premium in default, and the policy is not being continued as paid-up or extended insurance under the nonforfeiture provisions thereof, the Company will upon receipt of due proof of such disability, grant the following benefits subject to the terms and conditions herein set forth.

''Beginning with the anniversary of the policy next succeeding the commencement of such disability, the Company will waive the payment of further premiums, during the continuance of the disability, and will pay to the Insured, from the date of the commencement of such disability, or to the beneficiary if disability results from insanity, subject to the conditions and limitations of this provision, with the

written consent of the assignee, if any, a sum equal to one per centum of the face amount of the policy exclusive of any policy additions, and a like sum monthly thereafter during the continuance of the disability, until the maturity of the policy. . . .

"2. Disability Premium.—The disability benefits as set forth in this provision are granted in consideration of the statements and representations in the application for this policy and of a special yearly premium of $9.55. . . .

"4. Proof of Continued Disability.—The Company shall have the right to require at any time, but not oftener than once a year, due proof of the continuance of the disability. If the Insured shall fail to furnish such proof when required to do so, or shall so far recover as to be able to perform work of any kind for compensation, gain or profit, the disability benefits will be discontinued. . . ."

While the company's letter to the defendant, which we have quoted above, made no specific mention of fraud, the second amended complaint (as amended), upon which the case went to trial, definitely charged that fraud was practised by defendant upon plaintiff company, thereby inducing the issuance of the policies containing the disability clause, followed by defendant's additional fraud which procured payment of disability benefits beginning in April, 1927, namely, misrepresentations in his proofs of disability and proofs of continuance of disability. The trial court found that such fraud was perpetrated, and further that ". . . the present disability of defendant and the disability claimed by him to have commenced on or about April 28, 1927, in fact was caused by the disease of pulmonary tuberculosis contracted prior to the issuance of each of said policies involved in the within entitled action and is, and was, due to the same disease of pulmonary tuberculosis.

"It is true that the disease of pulmonary tuberculosis from which defendant suffered and for which and on account of which he received disability and waiver of premium benefits from plaintiff company, all as hereinbefore set forth, was the same disease contracted by defendant before the date of the issuance of each of said policies of insurance involved in the within action. . . .

"The court finds that any pulmonary tuberculosis, tuberculosis of the intestines, and tuberculosis of any organs of the body in or about the abdomen, intestines or otherwise,

from which the defendant was or is suffering or is now afflicted, were and are the same disease of tuberculosis and the extensions thereof which was contracted by defendant prior to the date of the issuance of each of said policies of insurance involved in the within action.

"The court further finds that the defendant Joseph Markowitz suffered from no disability within the terms and conditions of said policies of insurance involved in the within action subsequent to the issuance thereof, except such disability as may have resulted from the disease of tuberculosis which defendant contracted prior to the date of the issuance of each of said policies of insurance involved in the within action." Other findings were to the effect "that in September, 1933, plaintiff company first received information leading it to believe that the disease causing the disability of defendant Joseph Markowitz, to wit, pulmonary tuberculosis, was contracted prior to the date of the issuance of the policies of insurance involved in the within entitled action," and "that in paying said disability benefits and in waiving said premiums, plaintiff company did rely solely upon the representations and statements made by said defendant Joseph Markowitz in his proofs of disability and proofs of continuance of disability made by said defendant and his attending physicians, and upon the application for said policy and the reports as a part of said application, without any knowledge on the part of plaintiff company or any of its officers or agents that any of said representations, information or statements were false or untrue. . . . that if the said company had known at the time of the receipt of said proofs of disability and proofs of continuance of disability that the representations made therein were false and untrue, and that the representations and statements made in the application of defendant for said policy of insurance were false and untrue, plaintiff company would not have paid to defendant the disability benefits which it did pay to defendant as hereinbefore set forth and would not have waived the payment of premiums on said insurance contract by defendant to plaintiff during said period of disability."

These policies were issued by plaintiff, a Massachusetts corporation, to defendant then residing in the neighborhood of Boston, and, as required by the law of Massachusetts (Gen. Laws, 1921, chap. 175, Life Insurance, sec. 132 (2)), each contained an incontestability clause. It read as follows:

"This policy . . . shall be incontestable after it has been in force during the lifetime of the Insured for a period of one year from its date of issue except for non-payment of premium; but in case the age has been misstated, the amount payable hereunder shall be that which the premium paid would have purchased at the correct age." The respondent states in its brief "we concede that the incontestable clause applies to disability benefits. In other words, if the insured had become disabled by some disease contracted after the policy had been issued, the insurance company could not contest regardless of the fraud in the procurement."

The case of *Cohen* v. *Metropolitan Life Ins. Co.* (1939), 32 Cal. App.2d 337 [89 P.2d 732], presents a situation similar in many particulars to that which we are considering. In that case Cohen sued the insurance company to recover permanent disability benefits which had been discontinued and the company successfully cross-complained in an action to recover a sum equivalent to disability payments which it had previously made to Cohen and premiums which it had waived, both actions induced by the fraud of Cohen. The policies which figured in the Cohen case contained an incontestable clause, the effect of which was fully recognized by the court. A similar incontestable clause was held, by the writer of this opinion then sitting in the Superior Court of Los Angeles County, to be binding upon the insurance company in two cases in which gross fraud was perpetrated by the insured in securing a policy. These are *Mutual Life Ins.* v. *Margolis* (1936), 11 Cal. App.2d 382 [53 P.2d 1017], and *Coodley* v. *New York Life Ins. Co.* (1937), 9 Cal.2d 269 [70 P.2d 602]. One of defendant's present counsel represented the insured in both these cases and in cases of similar import, which he cites in his brief, namely, *Mutual Life Ins. Co. of New York* v. *Markowitz* (1935), 78 F.2d 396, (9 C.C.A.) and *New York Life Ins. Co.* v. *Kaufman* (1935), 78 F.2d 398, (9 C.C.A.). We are quite familiar by reason of the decisions in these cases with the principles stated therein and we note that the same effect was again given the incontestable clause in the instant case by the trial court. This appears from the following: "In this connection, the court finds that plaintiff in this action is not contesting the validity of the policies involved herein, or either of them, but on the contrary is relying in this action upon the said policies, and each of them, to recover the amount of disability benefits paid to de-

fendant and to set aside the waiver of premiums by reason of the fraud of defendant and for the reason that the disease for which defendant claimed disability was contracted prior to the issuance of the policies involved herein, and each of them, and is, therefore, not a disability insured against in either of said policies.''

While the incontestable clause would serve to defeat an action to void the policies upon the ground of fraud, there is nothing in the policies or in the law, so far as we know, which bars an action to recover payments made under a mistake arising from reliance upon false representations that there was no disease contracted or sustained before the issuance of the policies, when as a matter of fact the insured was suffering from the same disease several years previously, as the court found in the present instance. We note several recent cases in which the courts have recognized that an incontestable clause does not operate to extend the coverage of a policy to a disease contracted before the issuance of the policy. As stated in *Apter* v. *Home Life Ins. Co. of New York* (1935), 266 N.Y. 333 [194 N.E. 846, 98 A.L.R. 1281], ''From the inception of the policies the defendant excluded from their coverage disability which originated before the policies became effective. The plaintiff never acquired any insurance against such disability.'' The same thought is given expression in *John Hancock Mut. Life Ins. Co.* v. *Hicks* (1931), 43 Ohio App. 242 [183 N.E. 93, 95], where the court says, ''The incontestable clause does not have the effect of enlarging the diseases or bodily injuries for which the company agrees to compensate the insured or his beneficiary. . . .'' In the latter case, the total and permanent disability provision is exactly the same as in the instant case. In *Palumbo* v. *Metropolitan Life Ins. Co.* (1935), 293 Mass. 35 [199 N.E. 335], the following appears, ''whatever may be the scope of waiver in the law of insurance, it does not extend to the broadening of the coverage, so as to make the policy cover a risk not within its terms. That would require a new contract and cannot be accomplished by waiver (cases cited). . . .'' If the annual premiums due upon these $5,000 policies had been paid as they fell due they would not have been subject to cancellation, no matter how gross the fraud employed in securing them, but as part of his fraudulent scheme in procuring disability benefits to which he was not entitled under the terms of the policies, defendant secured also, by

the mistake into which he led the plaintiff, a waiver of annual premiums to which he was not entitled. This appears from the conclusion reached by the trial court, based upon its findings just quoted. The policies, in the view of the court, were not subject to cancellation but lapsed, because defendant failed to pay the premiums due thereon, the only proper reason for lapsation, as specified in the incontestability clause itself.

In reaching its conclusion that defendant obtained disability payments and waiver of premiums to which he was not entitled, the court determined that the officers of the plaintiff were designedly misled by defendant into believing that he was not suffering from tuberculosis contracted before his policies were issued in 1926, when, as a matter of fact, he had the disease as early as December, 1924. The trial court was called upon to consider, as bearing upon that question, certain documents which were admitted in evidence, including the application of the defendant, dated August 3, 1926, upon which both the policies were issued. This application consisted in part of statements to the company's medical examiner in which the following questions were propounded and answered as indicated:

"7. Q. Are you now in good health so far as you know or believe? A. Yes. . . .

"9. Q. Have you within six months lived with or been intimately associated with any person suffering from consumption? A. No. . . .

"13. Q. Have you ever been treated for any of the following? . . . hemorrhage from the lungs or stomach, consumption, pleurisy . . . or any other illness or any injury or surgical operation. A. Yes.

"Q. If Yes. Give full particulars with date, duration and result. A. Severe cold 1924, no pleurisy.

"14. Q. Have you had any medical advice during the past five years? State every instance with illness, dates, duration, severity and results and the names and addresses of the physicians who treated you. A. Yes.

"Q. If Yes, Give full particulars with date, duration and result. A. Injury to shoulder 1924. 1 visit. No sug.

"15. Q. Have you ever received or applied for treatment at any hospital, dispensary, sanitarium, cure or other institution? A. Yes.

"Q. If Yes, Give full particulars with date, duration and result. A. Tonsils removed 1914. New Haven Hospital."

Almost immediately after one year had elapsed from the date of issuance of the second policy, the defendant, on August 29, 1927, wrote the following letter to the plaintiff: "On March 24th I met with an accident to my back and shoulder and upon the advice of a doctor I was not allowed to work for four weeks. One week after I returned to work I became ill again and I consulted my present doctor on April 28th. He ordered me to discontinue all work for several months. His latest diagnosis is that I have 'Incipient Pulmonary Tuberculosis,' and that it will be several months before I can safely return to work. As this disables me from work for an indefinite period I believe I am entitled to compensation under my policy No. 1329930 and No. 1334357. Please advise." (Parenthetically, it may be noted that the diagnosis by the doctor, according to the evidence submitted, was not "incipient pulmonary tuberculosis" but "pulmonary tuberculosis".) This letter was followed by a disability benefit claim executed under oath by defendant on October 31, 1927. The following questions and answers appear in that claim as to both policies:

"6. State nature of disability. Pulmonary Tuberculosis.

"7. When did you become wholly disabled? April 28, 1927.

"8. When did you stop working? April 28, 1927.

"9. When were you first treated by a physician? March 24, 1927, consulted doctor Dr. C. M. Hensley for injury to my back and shoulder.

"10. Names and addresses of all physicians from whom you have received treatment and names of all hospitals in which you have been treated. Dr. C. M. Hensley, Colorado Blvd., Eagle Rock, Los Angeles, California. Dr. John W. Nevius, 1052 W. 6th St., Los Angeles, California. X Ray of chest by Dr. Johnson, Professional Bldg. Los Angeles, California. . . .

"14. Give names of other companies or associations from which you are receiving or have made claim for total and permanent disability benefits. Travelers Ins. Co., Equitable Life Assurance Co; New York Life Ins. Co., Mutual Life Ins. Co."

In support of his claim, defendant attached an attending physician's statement, made under oath on October 21, 1927, by John W. Nevius, M. D., in which the following questions and answers appear:

"3. Date of first visit in present disability? Apr. 28, 1927.

"4. When did the illness begin, that led up to insured's present disability? Mch. 24, 1927.

"5. State diagnosis and describe fully the injury, infirmity or disease causing disability. Cough & expect; hemoptysis, loss of wt & strength    afternoon fever. Diag. Pulmonary tuberculosis.

"6. Has insured been treated by any other physician or received treatment in any hospital, dispensary or public institution—Names and Addresses? When? D. K.

"7. Is insured now wholly disabled? Yes.

"8. If now wholly disabled, do you believe the disability will permanently prevent insured from the pursuit of any form of mental or manual labor for compensation, gain or profit whatsoever? Yes.

"9. When did insured become so wholly disabled? Apr. 28, 1927."

At the trial it appeared from the deposition of Dr. Nevius that his abbreviation "D. K.," employed in answer to question 6 above, stands for "Don't Know," and in that same deposition the following appears:

"Q. Dr. Nevius, with respect to the history of tuberculosis, if Mr. Markowitz had told you that he had been in the Loomis Sanatorium, [do] you think you would have remembered that?

"A. I should think I would. If he had said that, I certainly would have put it in my notes.

"Q. To the John Hancock?

"A. Yes."

This reference by counsel to the Loomis Sanatorium arose from the following situation: The defendant, while living at Mattapan, a suburb of Boston, was taken ill in the month of December, 1924. He was attended by Dr. Bradford Kent, on whose recommendation he entered Loomis Sanatorium in Sullivan County in the State of New York on February 9, 1925, where he was treated for tuberculosis. He stayed there until August 20, 1925, and during that time filed with the Standard Accident Insurance Company a claim, sworn to at Liberty, New York, on March 20, 1925. In support of his claim, two attending physicians' statements were presented, one by Dr. Kent, dated March 24, 1925, the other by Dr. Bertram H. Waters, physician in chief at Loomis Sanatorium, and in each of these physicians' certificates was a statement that he was suffering from pulmonary tuberculosis. On No-

vember 7, 1925, he filed another claim with the Standard Accident Insurance Company, in which he advised that corporation that he was disabled by "lung trouble," and with this was another certificate from Dr. Kent stating that his examination of the defendant in December, 1924, disclosed as the cause of his disability "pulmonary tuberculosis," and in which the following questions and answers appear:

"12. Do you consider the claimant a perfectly healthy man and subject to no chronic recurrent or other ailment which could in any way have prolonged or complicated his total disability above described? Ans. Has Pulmonary T. B. . . . .

"16. Give any facts which would throw any further light upon the case. Ans. Still ill but is able to get out daily for a little exercise."

This attending physician's statement is dated November 2, 1925.

Defendant resumed his employment as an automobile salesman that same month, having received from Standard Accident Insurance Company, between March and November of 1925, the sum of $620 for his disability, pulmonary tuberculosis. Approximately eight months later he indicated his approval of that kind of insurance by applying to plaintiff company for disability protection in connection with the two life insurance policies which were issued to him. Similar action was adopted with a number of other companies, with the result that approximately one year later he was claiming disability benefits from at least four other companies, according to his statement in the claim which he filed with plaintiff company. Evidence was before the trial court which indicated that before the present suit was brought, about six years later, defendant was in receipt of monthly disability payments from various companies amounting to approximately $600. Whether, as in the present instance, he designedly failed in his applications to give the other insurance companies a true account of prior hospital experience or prior illness with tuberculosis we are unable to say. It is clear, however, that in determining whether his claim for disability benefits in the present case had been founded on fact or falsity, the court had a right to consider the now admitted fact that contrary to the statements made in his application, this defendant had had such hospital experience and further that he had had pulmonary tuberculosis. The testimony given by certain of the physicians produced by the defendant, all

of whom were experts in the treatment of tuberculosis, related to this hospital experience and prior illness of the defendant, and automatically, we might say, the false statements made by this defendant in his application for insurance came to the attention of the court. That deception, as we have previously stated, would not be sufficient to invalidate the policies, because of the incontestability clause, but that does not mean that the court could not consider the false statements made in the application as part of the fraud which a year later came into full bearing when it misled the company into the view that defendant had suffered his disability after the policies were issued, a fraud which was not corrected by the defendant when, becoming disabled from the disease whose existence he had denied, he made proof of the beginning and the continuance of his disability. In other words, the question which the trial court had to determine in this case was not whether the policies containing the disability benefit provisions were procured by fraud, but whether the disability payments and waiver of premiums were secured by fraud. The fraud which procured the policies did not cease to operate when they were issued; it continued, as it should have been expected that it would, to determine plaintiff's course of action after the policies were incontestably in effect.

Defendant insists that his answers to the questions in the proof of disability were truthful and did not amount to a representation that he first contracted and became wholly disabled from tuberculosis after the issuance of the policies. The trial court had authority for the construction which it placed upon the statements, namely, that they constituted misrepresentations as to those material facts. They were practically identical with the statements contained in the proof of disability considered in the Cohen case, *supra*. We have examined the opening brief of the appellant in that case and we find that throughout some 16 pages he made the identical argument and cited the same authorities in attacking the finding of fraud as are presented to us on the same point. It was held on the trial of the Cohen case that the representations of Cohen constituted false and fraudulent statements to the effect that it was subsequent to the issuance of the policies that the disease originated and occurred and he was first disabled thereby. Upon the appeal the representations in the proof of disability were held sufficient to

support the finding. We regard that holding as directly applicable to the facts of the present case.

The trial court had a right to consider the false statements which defendant made in regard to his previous illness and hospitalization in his application for the policies, the false statements in the proof of disability which we have quoted, and also his representation in his letter of August 29, 1927, that his disease had been diagnosed as "incipient tuberculosis." The finding of fraud in the collection of disability payments by defendant has ample support in the evidence.

Also without merit is the attack made upon the findings that plaintiff believed, relied and acted upon defendant's false representations in making the disability payments and waiving payment of premiums. There was no direct evidence of such belief and reliance but direct evidence was not required. In such circumstances inferences which may be drawn from the acts of the parties are often more convincing than their sworn testimony as to their beliefs and motives. The success which crowned defendant's deceit is convincing evidence of its effectiveness. (*Mathewson* v. *Naylor* (1937), **18** Cal.App.2d 741 [64 P.2d 979]; *De Garmo* v. *Petitfils Confiserie* (1928), 93 Cal.App. 261 [269 P. 692].)

Notwithstanding the record and testimony submitted to the court which showed that Dr. Kent in November, 1925, stated that defendant was still ill with pulmonary tuberculosis and that he had been hospitalized for tuberculosis as late as August, 1925, at which time he was discharged from the Loomis Sanatorium as an apparently arrested case, the defendant contended at the trial that his tubercular illness in 1927 was not the same disease which incapacitated him in 1924 and 1925. His contention is that clinical symptoms of tuberculosis which appeared in March of 1927, marked the outbreak of a new disease of the same name.

In his examination of four tuberculosis specialists produced by defendant, his counsel asked each a hypothetical question as to the effect of an injury suffered by appellant on March 24, 1927, when he was struck on his chest by an automobile crank while attempting to start his car. Upon the answers elicited in response to this question and others propounded in his inquiry into this particular subject, appellant's counsel lay great stress in arguing that their client had been cured of tuberculosis prior to the issuance of the

policies. That argument, however, did not convince the trial court. The hypothetical question which was propounded to the four specialists included an assumption that the hypothetical patient during the period from November, 1925, to March, 1927, "had no expectoration and had no clinical symptoms such as night sweats, loss of appetite, pains in the chest, flushes, fever, and had no medication of any kind . . . and was not attended by physicians." This assumption was based upon appellant's testimony to the effect that the items inquired about described his own condition, but as respondent says in its brief, "the court was not obliged to believe that testimony. Defendant, by his own admissions, is a confessed liar. He confessed that he lied to get the policies and, of course, the court is not bound to give him full or any credence in what he said in his effort to collect upon them. (See Cal. Jur., Witnesses, par. 156; . . .)" This is plain language but is hardly subject to contradiction since the trial judge, by his own comments, showed that he was applying to the testimony of the defendant the time honored rule that has prevailed in regard to the credibility of witnesses. The hypothetical questions propounded to the four specialists also occasionally assumed other unproved conditions which eliminated this defendant as the hypothetical patient, as for example, the inquiry of Dr. Pottenger, hereinafter mentioned, concerning a patient who was "free of tuberculous disease prior to the trauma."

The hypothetical question addressed to Dr. Anderson concluded, "have you an opinion as to whether or not the trauma, that accident, reactivated the old infection, and inducing [induced?] a new tuberculosis episode of [or?] clinical tuberculosis or disease?" He answered that "it would be very logical to assume that if he had not had the trauma he would probably have been able to continue his work." Dr. Anderson was also asked whether between the time the patient was discharged when the disease was apparently arrested, up to the date of March 27, 1927, sufficient time had elapsed to be certain that the old disease or episode had disappeared. He answered, "Well, I do not think that you can use the word certain . . . You can use the word logical, and I think it was logical to assume that it was cured, but to be certain that it was cured is another story."

Dr. Pottenger was asked if he had "an opinion as to whether or not the trauma caused the reactivation of the tu-

berculous disease of which he was free prior to the trauma.'' He answered that he assumed it did, but under cross-examination stated that when, after a period of arrestment of a year or a year and a half, the patient again shows constitutional symptoms of tuberculosis ''I would say it might be an extension from the preceding disease—an extension or reactivation.'' He further stated that he did not make a distinction between infection and disease. In this same examination the doctor said, ''We would not say he was cured until two years or later,'' and when he stated that the defendant's condition was a reactivation of his old disease, was asked, ''Was that the same disease?'' and answered, ''The same infection. He had his old infection in 1924 and 1925, and the disease quieted down and was arrested, as we speak of it, and then he went about his work and had no symptoms from August or September, 1925, until March of 1927. We would have to assume then that the disease was arrested. Then a blow—the disease is not healed; it is not completely eliminated. The bacilli are in the tissues. And then a blow on the lung, being a compressible organ, would throw—might throw, but not necessarily—would throw a certain amount of pressure on all portions of it, and where the tissues are diseased, it is apt to cause a rupture or disturbance, and that is the way these hemorrhages usually occur.'' At another point, Dr. Pottenger's testimony was as follows: ''Q. So that what he had after the trauma in the way of activity would be called a new episode of clinical tuberculosis from an old infection, is that correct, Doctor? A. Yes, that is correct. Q. And so far as that episode was concerned, it first began with the administration of the trauma, is that right, Doctor? A. Yes, that is right.'' Dr. Pottenger further stated that he would say the defendant contracted the disease ''in 1924, 1925, but it had quieted down, and then through some cause, the trauma presumably, brought on a reactivation, of a disease which was apparently arrested.'' He later qualified this answer saying he meant ''it was a reactivation of the old infection or the bacilli in the system.'' All of this gives point to the inquiry made by counsel for respondent as follows: ''Q. Dr. Pottenger, when we get down to attempting to be very fine in our definition between tuberculer infection and tuberculer disease, after it has once manifested itself, it really amounts to a play on words, doesn't it? A. Yes.'' One gets the impres-

sion from reading the testimony of Dr. Pottenger and the other specialists that within the profession certain terms are occasionally used interchangeably, particularly, "clinical manifestation," "episode," "disease," and "infection."

The hypothetical question addressed to Dr. Howson concluded, "have you an opinion as to whether or not the trauma, the injury, was the proximate cause or reactivating agent of a tuberculous disease that was manifest in March or April, 1927?" He testified that "it is the logical assumption that the trauma was the activating agent," and further that with the history as given by defendant's counsel in his hypothetical question there would be a presumption that "the patient was free from the disease of tuberculosis, or tuberculous disease" prior to the trauma.

Dr. Sokol was asked, "have you an opinion as to whether or not the concussion [contusion ?] and trauma, was the proximate cause or activating cause that produced the disease of pulmonary tuberculosis which the doctor found and diagnosed in April, 1927?" He stated that in the case of the hypothetical patient "this trauma eventually caused a reactivation of the tuberculous infection which eventually caused a breakdown in his healing process, causing a hemorrhage." This physician further stated that when there is a reactivation he would say the reactivation is the new disease, but that "A common ordinary person wouldn't know the difference between infection and disease."

The testimony of these specialists produced by the defendant, recorded in some 175 pages of the transcript, is in many instances quite confusing and sometimes contradictory, but upon one thing they all agreed and that is, that after a case is diagnosed as "apparently arrested" a considerable time must elapse before the disease of pulmonary tuberculosis may be called "cured" or "apparently cured." The minimum period fixed by Dr. Sokol was twenty-one months; by Dr. Howson, two years and three months; the period fixed by Drs. Anderson and Pottenger was two and one-half years. As we have stated, the defendant had been discharged as an "apparently arrested" case on August 20, 1925, but was still ill with tuberculosis in November of that year, according to Dr. Kent's sworn statement. His policies were issued in August, 1926, approximately a year after his discharge and, according to his own testimony, he had a hemorrhage in March, 1927, prior to the expiration of the minimum time which, accord-

ing to Dr. Sokol, must elapse between the classifications of "apparently arrested" and "apparently cured." It is worthy of note that both Dr. Sokol and Dr. Howson stated that they would want to examine the patient after the lapse of the period mentioned by each of them before determining that a cure had been effected.

The question which the court was called upon to decide was whether on March 24, 1927, the date when he was injured while cranking his automobile, the defendant had been cured or was free from the disease from which he had been suffering. The trial judge was justified, on the testimony of all four of the specialists produced by the defendant, in determining that he was not at that time free of the tuberculous ailment which he had when discharged from the hospital on August 20, 1925, approximately nineteen months previously and, therefore, that the disease resulting in the disability for which he claimed payments were due was contracted before the policies were issued; consequently, was not included in the coverage of the policies. In this case, the trial judge announced his decision from the bench at the conclusion of testimony, and certain language used by him at that time is quoted in an affidavit of counsel for the defendant made in support of his motion for new trial. The passage is rather lengthy, but a single excerpt from it will show the process of the trial judge's reasoning, and we do not take exception to it. It reads as follows:

"In other words, he had tuberculosis and he had it back in 1924 or 1925 and it was apparently arrested although never pronounced cured, and then, within less than the minimum period testified to by Dr. Howson this morning, the disease flared up again. Very probably what caused it to flare up again was the blow of the automobile crank, but the disease must have been there or it could not have flared up. I think it is something like a fire that flares up then finally dies down, and there is no flame visible, and yet, if you apply the bellows to it, it will break out again. There must have been a fire there in the first place, and the fire had to be there all the time to make it break out again. It was the same fire but it had died down, and to all intents and purposes as far as any one could see there was no fire but just ashes. So here the disease could not reactivate or flare up again if it had not been there to be reactivated. In other

words, the popular meaning, I think, is more sensible· than the medical meaning, and under the general rules of statutory construction we must accept the popular meaning of the word.

"So the Court finds as a fact that the tuberculous disease, from which the defendant suffered from and after the time that he had the trouble in cranking his machine was the same tuberculous disease that he had in 1924 or 1925, and was not contracted after the date of the policy but had been contracted before the date of the policy."

In an effort to extricate their client from the difficult situation in which he has landed by reason of his fraud, appellant's counsel have presented a lengthy answer and in addition thereto seventeen separate and distinct defenses. In these they have leaned heavily on the doctrines of estoppel and waiver. ■ So far as estoppel is concerned, we find the simple rule stated in *Kemper* v. *Industrial Acc. Com.* (1918), 177 Cal. 618, 621 [171 P. 426], that "The person asserting an estoppel must be induced to act or refrain from acting by his opponent's conduct. (*Barnhart* v. *Fulkerth,* 93 Cal. 497 [29 P. 50].)" There can be no question that in the present case the defendant refrained from paying his annual premiums and he wants us to believe that he was led into that position to his prejudice by the action of the plaintiff insurance company in recognizing his claim for disability and making payments thereon; but, as we see it, that would be a complete perversion of the doctrine of estoppel for the company was led into the position of making payments to its prejudice by the fraudulent action of the defendant. ■ The equitable doctrine of estoppel can never operate to protect one from the consequences of his fraud. ■ Nor can we accept the appellant's view that in September, 1933, the respondent forever waived its right to declare the policies void when, acting upon a report made by Dr. English° that the defendant was no longer wholly or permanently disabled, it demanded premium payments from the defendant. At the time of that demand plaintiff had not discovered the fraud of the defendant in connection with his claim for disability. That discovery came approximately two months later when the plaintiff learned from another insurance company that the defendant, contrary to the statements made in his application for policies and in his application for disability benefits, had been hospitalized for tuberculosis in the year 1925. ■ There seems to us no merit in defendant's additional contention that plain-

tiff had waived its right and is now estopped from setting up the previous tuberculosis history as a defense on the ground that by using reasonable care and diligence it could have discovered whether or not the defendant had any previous history of tuberculosis, or that by its long continued payments of disability benefits it waived its right to set up as a ground of action any claim of mistake or fraud. In support of this claim the appellant calls attention to the fact that one Joseph Cahalan, custodian of the records of the Health Department of the City of Boston, testified in a deposition taken in that city that the records of the department showed that Dr. Kent had reported the defendant as a tubercular patient in December of 1924 and that a search of the public records would have disclosed that fact before the plaintiff company began to make the disability payments. Mr. Cahalan, however, testified that the records of his department were available only upon subpoena and we do not subscribe to the theory that it is necessary, when there is nothing in the application for a policy suggesting a source of particular inquiry, for an insurance company to keep a constant check upon municipal records to determine whether or not its applicants for policies are telling the truth. ■■■ Another claim of the defendant was that the plaintiff was estopped from changing its position as first announced in its letter of September 12, 1933, whereby it notified defendant that it was discontinuing disability payments because he was no longer wholly and permanently disabled. He characterizes the sending of Mr. Taylor's letter of November 20, 1933, as an attempt on the part of the insurance company to "mend its hold," claiming that the plaintiff is estopped from changing its position as defined in the letter of September 12th, which reads as follows:

"Mr. Joseph Markowitz
1032 Kagawa Street,
Pacific Palisades, Calif.
"Dear Mr. Markowitz:

"The Company has received the medical examination completed by our Dr. English and according to the information submitted, it appears that you are no longer wholly and permanently disabled within the terms of your policy. They are, therefore, discontinuing payment of further disability benefits as a result of which you should resume payment of premium as of August 5, 1933 under policy # 1329930 and

August 18, 1933, under policy # 1334357. You will be granted thirty days from the date of this letter in which to pay the premiums, the due date of which are mentioned above.

> Very truly yours,
> H. G. SAUL, General Agent
> EGJ:LML        by E. G. JAMES"

Shortly before this letter was written and on August 19, 1933, the Aetna Insurance Company had written the respondent stating that they had been paying the defendant $100 a month since July 27, 1927 "because of disability given as tuberculosis," and making inquiry as to the present status of defendant's case with the respondent. Immediately thereafter on August 25, 1933, the respondent asked its physician, Dr. English, for a report upon the defendant's condition. This report was furnished on September 1, 1933, and stated that "There is no doubt that this man has had a slight attack of pulmonary tuberculosis, but it is entirely healed at this time. This involvement was only on the right side." As a result, the letter of September 12th, discontinuing payment of further disability and calling upon the defendant to resume payment of his premiums, was sent. Further correspondence ensued between the Aetna Life Insurance Company and the respondent with the result that on October 5, 1933, the respondent received information from still another insurance company that the defendant had suffered from pulmonary tuberculosis during the period, December 20, 1924, to November, 1925. On investigation and within a month thereafter, Mr. Taylor's letter of November 20, 1933, was sent to the defendant and on December 27, 1933, the original complaint in this case was filed. There is nothing in this record to support the claim that the defendant suffered any injury or impairment of his rights by plaintiff's "mending its hold." On the contrary, the record clearly indicates that there was no intention on the part of plaintiff in September, 1933, to terminate the policies held by the defendant, but when it became apparent that he had employed gross fraud in securing his disability payments as well as the waiver of the regular annual premium payments, then the decision was reached seasonably, and in our opinion rightfully, to forfeit the policies and seek to recover the amounts that had been obtained through fraud.

The foregoing recital has a special bearing upon the mat-

ters that were decided by the Honorable Parker Wood when, upon motion of the defendant made under section 597 of the Code of Civil Procedure, the court proceeded to the trial of the defense appearing in defendant's answer alleging that plaintiff's second amended complaint, as amended, and each of the counts thereof, were barred by section 338, subdivision 4, of the Code of Civil Procedure. At that hearing the judge, then presiding in the superior court, found that the plaintiff company, in September, 1933, first received any information leading it to believe that the representations made by the defendant in his proofs of disability, in his applications for his policies of insurance, as well as in his representations made through his attending physicians in the proofs of disability and proofs of continuance thereof, were untrue; further, that the plaintiff company in September, 1933, first received information leading it to believe that the disease causing the disability of the defendant, namely, tuberculosis, was contracted prior to the dates of the policies of insurance involved in the action and prior to the date of the application for each of said policies. Accordingly, the court decided that the bar of the statute of limitations was not effective and that the cause of action was commenced within the period of time required by the statute; also, that the plaintiff was not guilty of laches in any particular. We are impressed by the statement in respondent's brief ''that the action did not have for its purpose the rescinding of the insurance contracts because of the fraud committed in 1926 when the policies were obtained. The suit is to recover disability payments made under the policies for the years 1927 to 1933. The suit is based upon fraud and mistake in making the disability payments. The fraud (and/or mistake), therefore, *was a continuing fraud* (and/or mistake). This fraud continued up to approximately the time of filing suit.''

The respondent calls attention to the fact that ''During the period from 1927 to 1933, the defendant continued to assert that he was entitled to disability payments for a disease contracted after the issuance of the policies. Even as late as September, 1933, when he was examined by Dr. Glenn English at the company's request, he maintained that he had suffered from tuberculosis for only five years previous. . . . At no time in the interval did he disclose the previous existence of the disease or the names of the doctors who had

treated him in 1925 or that he had been in a tubercular sanitarium in 1925.'' ▮ Under all the circumstances, we feel that the statement in *Rutherford* v. *Rideout Bank* (1938), 11 Cal.2d 479, 485 [80 P.2d 978, 117 A.L.R. 383], is applicable, ''The rule is clearly stated in *Victor Oil Co.* v. *Drum,* 184 Cal. 226, 241 [193 P. 243] : 'The courts will not lightly seize upon some small circumstance to deny relief to a party plainly shown to have been defrauded against those who have defrauded him on the ground, forsooth, that he did not discover the fact that he had been cheated as soon as he might have done. It is only where the party defrauded should plainly have discovered the fraud except for his own inexcusable inattention that he will be charged with discovery in advance of actual knowledge on his part.' ''

▮ On the trial of the case before Judge Burnell, it appeared that there was no merit in various other grounds of estoppel mentioned among the separate defenses, for example, the claim that a tender of two cashier checks to the plaintiff in the sum of $317.40 each, as premiums on the two policies for the years 1934 and 1935, operated to estop the plaintiff from declaring that the premiums on the policies had not been paid. A letter was introduced showing that the company declined to accept the checks ''because said policies lapsed as of the due date of the premium falling due after the premium last actually paid by your client'' and returned them, counsel for the defendant then stating that he had received them. ▮ The defendant's additional claim that the plaintiff company waived all rights it had to declare the policies void when it demanded premium payments from the defendant on the policies in September, 1933, was also shown to be groundless. The letter of September 12th was introduced clearly indicating that the company then had no intention of forfeiting the defendant's policies but, on the contrary, granted him an extension of thirty days from that date in which to pay the annual premiums which had fallen due on August 5th and August 18, 1933, and enabled him to meet those payments by applying ''the sum necessary for payment of said premium from the cash surrender value of the policy in accordance with the automatic application of the Policy Loan Provision thereunder,'' according to a notice dated October 4, 1933. Then, two months later, the plaintiff company determined that it had been defrauded and took the position that the defendant by means of the

fraud had secured not only disability payments but waiver of the annual premiums due thereon. This same fraud, of course, vitiated the payment of the premium which was made "by application of the cash surrender value," which was in fact nonexistent because it could have accrued only while the policies were in good standing during the preceding seven years. The court in its judgment decreed that one of the defendant's policies lapsed on the 5th day of August, 1927, and the other on the 18th day of August, 1927, for the non-payment of the premium due thereon and "that since said dates, respectively, said policies, and each of them, have been and are now of no further force or effect. . . ."

In his cross-complaint, as amended, defendant claimed that he was entitled to disability benefits and also alleged that "cross-complainant, on or about March 24, 1927, sustained a severe bodily injury and trauma to his chest, shoulders and back, and by reason of, and as a result thereof, cross-complainant, from and after said date, suffered from, and became afflicted with, the disease of pulmonary tuberculosis, tuberculosis of the intestines, and with tuberculosis of the organs of the body in and about the abdomen and intestines; and that on or about April 28, 1927, cross-complainant became wholly and permanently disabled by bodily injury and disease, sustained and contracted after the date of the issuance of said policy; . . ." Upon these allegations defendant's counsel argues that the bodily injury sustained in March of 1927 caused the disability of the defendant and that since that injury was sustained after the issuance of the policy the disability payments were within the coverage of the policy. This contention we believe is answered by counsel for respondent where he says, "Assuming, however, arguendo, that appellant may now at this late date rely on the accident provisions of the policies, respondent nevertheless insists that the position of appellant is not well taken. The question, of course, as to whether or not the disability arose from the accident or from a prior contracted disease is a question of fact. It is a question of proximate cause of the disability and proximate cause is a factual question. The court has resolved the factual question against the appellant and appellant's contention that there is no evidence to support the finding is not supported by the record." In regard to the bodily injury, the court found that while the defendant

received a blow upon his chest on or about March 24, 1927, "it is not true that on or about said date defendant sustained a severe bodily injury or trauma . . . and it is not true that by reason of any such blow or the result thereof, defendant suffered from or became afflicted with any disease and in particular the disease of pulmonary tuberculosis." Dr. Hensley, who attended the defendant at the time of his bodily injury, stated that he found an abrasion at about the inner angle of the clavicle and the neck where the skin was rubbed off over an area of approximately one inch in length and one-half inch wide. He also testified that there was a bruise below the abrasion approximately three inches in diameter.

As we have stated, the original complaint in this action was filed in December of 1933, and in the ensuing two years various demurrers and motions to strike were passed upon and amended pleadings filed. Then, according to the record, after a lapse of five years present counsel for appellant first appeared officially when he stipulated on March 14, 1940, that the amendment to the plaintiff's amended complaint might be filed. However, among the exhibits in the case is a letter of July 27, 1935, in which he notified the plaintiff company that he represented Joseph Markowitz. On May 1st of 1940 the case was assigned to the court of the Honorable Joseph W. Vickers for trial, but before testimony was introduced an objection was made to the introduction of evidence on the ground that the amended complaint did not state facts sufficient to constitute a cause of action. This objection was sustained and the plaintiff given until July 1, 1940, to amend its pleading, the defendant being allowed an additional month to plead or answer thereto. The appellant assigns this action as error on the part of the trial court and asserts that it was an abuse of the court's discretion in view of the fact that the case had been pending at that time for nearly seven years. However, it is apparent that for some reason with which we are not familiar, but which may have been disclosed to Judge Vickers, no one was in any hurry to have this action tried, and we do not feel that there was any abuse of discretion, especially in view of the statement in *Frost* v. *Witter* (1901), 132 Cal. 421, 424 [64 P. 705, 84 Am. St.Rep. 53], "that great liberality should be used by the courts in allowing amendments (*Burns* v. *Scooffy*, 98 Cal. [271] 276 [33 P. 86], and cases cited); and that the allowance of amendments is a matter within the discretion of the

courts. (*Coubrough* v. *Adams,* 70 Cal. [374] 378 [11 P. 634]; *Lestrade* v. *Barth,* 17 Cal. 228 [285].) And in practice the courts have been extremely liberal, . . ."

█ Some reliance is placed upon the claimed failure of the plaintiff company to comply with a Massachusetts statute (chap. 175, sec. 129, Gen. Laws of Mass. 1921), requiring insurance companies delivering policies in that state to set forth on the face of the policy in bold letters a plain description thereof and its peculiarities. We have inspected the policies and note that the clause governing total and permanent disability benefit provisions is boldly displayed on page three thereof. Knowing that the appellant is, by his own statement in court, a graduate of one of the oldest and best of our universities, and further, that he is a man of keen intelligence, as indicated by his performance as a witness at the trial and also by documents which were admitted as exhibits, the trial court was justified in concluding that he was not misled by the form, print, or content of the total and permanent disability benefit provision, but understood the clause in its entirety and, particularly, that he was protected from financial loss resulting from disability arising from bodily injury or disease sustained or contracted after, and not before, the respective dates of the policies.

Two judgments were entered in this case, one by Judge Wood, on November 6, 1941, on the issues presented under section 597 of the Code of Civil Procedure, the other by Judge Burnell, on the 18th day of May, 1942, on all issues raised by the pleadings. █ The notice of appeal was filed June 18, 1942, more than sixty days after the entry of Judge Wood's judgment and, therefore, cannot be effective so far as that judgment is concerned. However, his decisions may be and have been reviewed on the appeal taken from Judge Burnell's judgment within the time fixed by the statute. The appeal from Honorable Parker Wood's judgment is ordered dismissed and the judgment entered by Honorable Charles S. Burnell is ordered affirmed. The purported appeal from the order denying defendant's motion for a new trial is dismissed.

Shinn, J., and Bishop, J. pro tem., concurred.

A petition for a rehearing was denied February 15, 1944, and appellant's petition for a hearing by the Supreme Court was denied March 16, 1944.