[No. S053421. Feb. 24, 1997.]

AMEX LIFE ASSURANCE COMPANY, et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
SLOME CAPITAL CORP., Real Party in Interest.

COUNSEL

Adams, Duque & Hazeltine, Nancy Garelick, Manatt, Phelps & Phillips and Margaret Levy for Petitioners.

David M. Leifer, Reese R. Boyd III, James H. Fleming, Robert R. Pohls, Barger & Wolen, Gail E. Cohen, Michael J. Rothman, Fulbright & Jaworski and Peter H. Mason as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Harold E. Kahn, Hogan, Baynes & Haworth, Timothy J. Hogan and Jack M. Zakariaie for Real Party in Interest.

OPINION

CHIN, J.—In 1991, the Amex Life Assurance Company (Amex) issued a life insurance policy to Jose Morales. The policy contained what is called an "incontestability" clause: "We will not contest coverage under the Certificate [of insurance] after it has been in force during the life of the Covered Person for two years from the Certificate Effective Date, if all premiums have been paid."

As early as 1915, this court described this type of incontestability clause —now required by statute in all group and individual life insurance policies —as " 'in the nature of . . . statutes of limitations and repose . . . .' " (*Dibble* v. *Reliance Life Ins. Co.* (1915) 170 Cal. 199, 209 [149 P. 171] (*Dibble*); see Ins. Code, §§ 10113.5, 10206.) After the premiums have been paid and the insured has survived for two years, the insurance company may not contest coverage even if the insured committed fraud in applying for the policy. The incontestability clause, we have explained, " 'is not a stipulation absolutely to waive all defenses and to condone fraud. On the contrary, it

recognizes fraud and all other defenses but it provides ample time and opportunity within which they may be, but beyond which they may not be, established.' " (*Dibble, supra,* 170 Cal. at p. 209.)

In this case, Morales knew he was HIV (human immunodeficiency virus) positive when he applied for life insurance. He lied on the application form and sent an impostor to take the mandatory medical examination. With minimal effort, Amex could have discovered the fraud even before it issued the policy, but instead it collected the premiums for more than two years until Morales died. After the beneficiary filed a claim, Amex discovered from information long available that an impostor had taken the examination, and it denied the claim. Today, while recognizing that it is too late to contest coverage due to fraud, Amex urges us to adopt the so-called "impostor defense" that some states recognize. As generally applied, the defense provides that when a person applies for a life insurance policy and takes the medical examination but names another person as the insured, the policy does not insure the named person but, if anyone, the person who completed the application and took the examination.

We need not decide whether to adopt the impostor defense because the facts of this case do not come within it. Here, the named insured, Morales, himself applied for the policy and did everything except take the medical examination. The policy insured him, not someone else. The fraud, though abhorrent and clearly justifying rescission of the policy during the two-year contestability period, is not qualitatively different from other types of fraud California courts have held may not be used to contest coverage once the contestability period has expired if the premiums have been paid. Therefore, Amex, which did nothing to protect its interests but collect premiums until Morales died after the contestability period, may no longer challenge coverage on the basis that an impostor took the medical examination.

For these reasons, we affirm the judgment of the Court of Appeal, which reached a similar conclusion.

## I. FACTS AND PROCEDURE BELOW

Jose Morales applied for a life insurance policy from Amex in January 1991. Although he apparently knew he was HIV positive, he lied on the application form and denied having the AIDS (acquired immune deficiency syndrome) virus. As part of the application process, Amex required him to have a medical examination. In March 1991, a paramedic working for Amex met a man claiming to be Morales and took blood and urine samples. It is not disputed in this proceeding that this man was an impostor. On his

application, Morales listed his height as five feet six inches, and his weight as one hundred forty-two pounds. The examiner stated the man claiming to be Morales was five feet ten inches tall and weighed one hundred seventy-two pounds. The examiner also noted that the man produced no identification and appeared to be "unhealthy or older than stated age." The blood sample tested HIV negative.

Amex issued Morales a life insurance policy containing the incontestability clause effective May 1, 1991. All premiums have been paid. Morales died of AIDS-related causes on June 11, 1993. Shortly before his death, he sold his policy to Slome Capital Corp. (Slome), a viatical company engaged in the business of buying life insurance policies at a discount before the insured's death. In the interim, another insurance company assumed Amex's policies. (For convenience, we will refer to both companies collectively as Amex.) Amex states that after Morales died, an "informant" advised it that an impostor, and not Morales, appeared for the medical examination.

Amex conducted an investigation and then denied Slome's claim for the policy proceeds. The letter denying the claim noted the discrepancies between the stated height and weight of the applicant and the person who appeared for the medical examination. It stated that a handwriting expert determined that the person who signed the insurance application was not the person who signed the medical test form and medical questionnaire. The expert's report stated that the signatures contained "gross differences." The letter concluded "that the person who was examined and gave blood is different from the person who applied for coverage. The only possible explanation for this is that the applicant, who we have reason to believe was previously diagnosed as HIV positive, intended to deceive Amex in order to get insurance coverage." Amex denied payment on the basis that "When Mr. Morales applied for life insurance on his own life but substituted another individual for himself in the examination so that the policy would be issued based on the other person's medical condition, he caused Amex to issue a policy on the life of someone other than himself."

Slome sued Amex for breach of contract, insurance bad faith, and equitable estoppel. The superior court denied Amex's motion for summary judgment, ruling that "California does not recognize the impostor defense to the incontestability clause." Amex filed the instant proceeding in the Court of Appeal seeking a writ of mandate directing the superior court to grant its summary judgment motion. The court granted the petition as to the bad faith cause of action but, finding that the impostor defense, even if it exists, does not apply here, denied it in all other respects.

The majority opinion, authored by Justice Godoy Perez, concluded that its "refusal to adopt the impostor defense on these facts will place a minimal

burden on insurance companies: before providing a medical exam and issuing a policy, they must at least take reasonable steps to ensure the person being examined is the person he claims to be. A contrary ruling will undermine the public policy of requiring diligence by the insurer and instead place a potentially heavy burden on policyholders and the courts as a result of litigation arising from the additional policy contests which are sure to ensue." (Fn. omitted.) Presiding Justice Turner authored a concurring opinion urging "the Legislature to consider narrow changes in the law relating to incontestability clauses" and to provide an exception "when a person other than the insured takes" the mandatory physical examination.

We granted Amex's petition for review.

## II. DISCUSSION

### A. *Incontestability Clauses*

"Incontestability clauses have been used by the insurance industry for over one hundred years to encourage persons to purchase life insurance." (Note, *AIDS and the Incontestability Clause* (1990) 66 N.D. L.Rev. 267.) "Insurance companies initially offered the incontestability clause as a policy provision because of public distrust of insurers and their promises to pay benefits in the future." (*Id.* at p. 268.) Today, these clauses are "required by statute in most states because without them, insurers were apt to deny benefits on the grounds of a pre-existing condition years after a policy had been issued. This left beneficiaries, particularly those in life insurance settings, in the untenable position of having to do battle with powerful insurance carriers. *See 7 Williston on Contracts* § 912.394 (3d ed. 1963) (noting that these clauses came from the 'early greed and ruthlessness of the insurers' who 'too often . . . resisted liability stubbornly on the basis of some misstatement made by the insured at the time of applying for the policy')." (*Wischmeyer* v. *Paul Revere Life Ins. Co.* (S.D.Ind. 1989) 725 F.Supp. 995, 1000.) ■ The "clauses are designed 'to require the insurer to investigate and act with reasonable promptness if it wishes to deny liability on the ground of false representation or warranty by the insured.' G. Couch, 18 *Couch on Insurance* § 72.2 at 283 (1983). 'It prevents an insurer from lulling the insured, by inaction, into fancied security during the time when the facts could best be ascertained and proved, only to litigate them belatedly, possibly after the death of the insured.' *Id.* at 283-84." (*Ibid.*)

Justice Holmes stated succinctly the purpose behind the incontestability clause: "The object of the clause is plain and laudable—to create an absolute assurance of the benefit, as free as may be from any dispute of fact except

the fact of death, and as soon as it reasonably can be done." (*Northwestern Life Ins. Co.* v. *Johnson* (1920) 254 U.S. 96, 101-102 [41 S.Ct. 47, 49, 65 L.Ed. 155].)

The California experience followed the usual historical pattern: Incontestability clauses came first, then statutes requiring them. We first confronted an incontestability clause in *Dibble*, where we concluded "that a provision in a life insurance policy to the effect that after being in force the specified time, it shall be incontestable, precludes any defense after the stipulated period on account of false statements warranted to be true, even though such statements were fraudulently made . . . ." (*Dibble, supra,* 170 Cal. at p. 208.) This conclusion does not condone fraud but merely establishes a time limit within which it must be raised. " 'It is not a stipulation absolutely to waive all defenses and to condone fraud. On the contrary, it recognizes fraud and all other defenses but it provides ample time and opportunity within which they may be, but beyond which they may not be, established. It is in the nature of and serves a similar purpose as statutes of limitations and repose, the wisdom of which is apparent to all reasonable minds. It is exemplified in the statute giving a certain period after the discovery of a fraud in which to apply for redress on account of it and in the law requiring prompt application after its discovery if one would be relieved from a contract infected with fraud.' " (*Id.* at p. 209.)

Years after *Dibble*, the Legislature enacted statutes requiring every life insurance policy to contain an incontestability clause: in 1935 for group policies (Ins. Code, § 10206 ["[t]he policy shall provide that the validity of the policy shall not be contested, except for nonpayment of premiums, after it has been in force for two years from its date of issue"]), and, effective in 1974, for individual policies (Ins. Code, § 10113.5 ["[a]n individual life insurance policy delivered or issued for delivery in this state shall contain a provision that it is incontestable after it has been in force, during the lifetime of the insured, for a period of not more than two years after its date of issue, except for nonpayment of premiums"]). (The parties question which of these two statutes applies to the policy of this case. As the Court of Appeal recognized, it does not matter; for our purposes, the two statutes are substantially identical.)

The Court of Appeal opinion summarized the case law following *Dibble*: "Numerous decisions since *Dibble* have held that even gross fraud by an insured who lied about his health in applying for life insurance falls within the terms of an incontestability provision. (*Metzinger* v. *Manhattan Life Ins. Co.* [(1969) 71 Cal.2d 423, 428-429 (78 Cal.Rptr. 463, 455 P.2d 391)] [relying on *Dibble*'s holding that fraud as to insured's health condition fell

within an incontestability clause when construing [Insurance Code] section 10206]; *New York Life Ins. Co.* v. *Hollender* (1951) 38 Cal.2d 73, 77-79 [237 P.2d 510] [after the prescribed lapse of time, the incontestability clause 'prevents nullification of the insurance contract for any cause not excepted in the clause']; *Coodley* v. *New York Life Ins. Co.* (1937) 9 Cal.2d 269, 272, 274 [70 P.2d 602] [incontestability clause prevents policy contest on grounds the policy was procured by fraud]; *Schaefer* v. *California-Western States Life Ins. Co.* (1968) 262 Cal.App.2d 840, 845 [69 Cal.Rptr. 183] [same]; *John Hancock etc. Ins. Co.* v. *Markowitz* (1944) 62 Cal.App.2d 388, 396-397 [144 P.2d 899] [incontestability clause binding on insurance company even in the face of gross fraud]; *Trousdell* v. *Equitable Life Assur. Soc.* (1942) 55 Cal.App.2d 74, 77-81 [130 P.2d 173]; *Braun* v. *New York Life Ins. Co.* (1941) 46 Cal.App.2d 335, 346 [115 P.2d 880]; *Blair* v. *New York Life Ins. Co.* (1940) 40 Cal.App.2d 494, 501 [104 P.2d 1075]; *Mutual Life Ins. Co.* v. *Margolis* (1936) 11 Cal.App.2d 382, 384-385 [53 P.2d 1017].)"

The Court of Appeal discussed the "[s]ound public policy considerations" behind this rule. "The *Dibble* court adopted in part the Court of Appeal's earlier decision, which stated: ' ". . . It has often been held that a provision of that kind is valid because it is in the nature of a limitation of the time within which the defendant [insurer] may avoid the policy for this cause. Such a provision is reasonable and proper, as it gives the insured a guaranty against possible expensive litigation to defeat his claim after the lapse of many years, and at the same time gives the company time and opportunity for investigation, to ascertain whether the contract should remain in force. It is not against public policy, as tending to put fraud on a par with honesty." ' (*Dibble, supra,* 170 Cal. at p. 202, quoting *Reagan* v. *Union Mutual Life Ins. Co.* (1905) 189 Mass. 555 [76 N.E. 217].) 'The incontestable clauses are enforced with particularity by the courts because of the desirable purpose which they have. It is their purpose to put a checkmate upon litigation; to prevent, after the lapse of a certain period of time, an expensive resort to the courts—expensive both from the point of view of the litigants and that of the citizens of the state. In that way, it is a statute of limitations upon the right to maintain certain actions or certain defenses . . . .' (1A Appleman, Insurance Law and Practice (rev. ed. 1981) § 311, p. 311, fns. omitted.) [¶] The need for such protection becomes especially clear for life insurance policies, where the contest is usually made after the named insured has died, robbing the beneficiaries of their most potent witness."

A recent decision has reaffirmed the continuing application of incontestability clauses to fraud claims. In *United Fidelity Life Ins. Co.* v. *Emert* (1996) 49 Cal.App.4th 941 [57 Cal.Rptr.2d 14], the insurance company issued Emert a life insurance policy with a disability rider. Although knowing he was HIV positive, Emert stated on the application he did not have an

"immune deficiency disorder," and, when asked to list all physicians he had seen in the last five years, listed only a general practitioner and not an HIV specialist who had been treating him regularly. (*Id.* at p. 943.) After the two-year contestability period, Emert submitted a disability claim. Relying on many of the cases cited above, the Court of Appeal held that the incontestability clause prevented the insurance company from contesting the claim on the basis of the fraudulent conduct. (*Id.* at pp. 945-947.)

With this backdrop, we now consider the "impostor defense" that Amex seeks to assert.

## B.  *The "Impostor Defense"*

A few decisions outside California have allowed an insurer to contest a claim despite the incontestability clause when an impostor claimed to be the named insured. The first was *Maslin* v. *Columbian Nat. Life Ins. Co.* (S.D.N.Y. 1932) 3 F.Supp. 368 (*Maslin*). In *Maslin*, the insurance company issued policies insuring "Samuel Maslin." After the period of contestability expired, the company asserted the defense "that an impostor posing as Samuel Maslin made the application and took the physical examination for the policies . . . ." (*Id.* at p. 369.) The court recognized the general rule "that after the passage of the stipulated time [of contestability] the insurance company is precluded from contesting the policy on the ground of false representations by the insured, even those made fraudulently." (*Ibid.*) "The view is that even though dishonest people are given advantages under incontestability clauses which any right-minded man is loath to see them get, still the sense of security given to the great majority of honest policyholders by the presence of the clause in their policies makes it worth the cost. The time allowed to the insurance company after issuance of the policy to investigate the case and uncover any fraud is deemed a fair check against trickery or deception by the insured." (*Ibid.*)

Nevertheless, the *Maslin* court found the defense of "the alleged impersonation of Samuel Maslin by another who is said to have made the application and, more important still, to have taken the physical examination, is not barred by the incontestability clause. In substance, the defendant's position is that it never insured the life of the plaintiff's son at all and never had any contract or contractual dealings with him; that the man it insured was another person altogether, a healthy man whom the defendant's medical examiner saw and accepted as a risk and who chose to call himself Samuel Maslin . . . . If the facts pleaded are borne out by the proof, the defendant is under no liability to the plaintiff. There cannot be the slightest doubt that the person whom an insurance company intends to make a

contract with and intends to insure is the person who presents himself for physical examination." (*Maslin, supra,* 3 F.Supp. at pp. 369-370.)

Relying on the "rule applicable to contracts generally that where a man, pretending to be some one else, goes in person to another and induces him to make a contract, the resulting contract is with the person actually seen and dealt with and not with the person whose name was used," the *Maslin* court concluded that "if the defendant can prove that a healthy man impersonated a diseased Samuel Maslin and took the medical examination under the name of Samuel Maslin, then the diseased Samuel Maslin who was the plaintiff's son did not become a policyholder . . . . The defendant's only contract was with the man who made the application and took the examination. [¶] It is obvious that the interposition of these matters by the defendant is not a contest of the policies within the meaning of the incontestability clause. The insurer does not by this defense dispute the validity of the policies issued by it. It says in effect that the man it insured under these policies was not the plaintiff's son, Samuel Maslin." (*Maslin, supra,* 3 F.Supp. at p. 370.)

The second case and, with *Maslin,* one of the two most cited cases on this question, is *Ludwinska* v. *John Hancock Mut. Life Ins. Co.* (1935) 318 Pa. 84 [178 A. 28, 98 A.L.R. 705] (*Ludwinska*). In *Ludwinska,* Bertha Ludwinska applied for a life insurance policy and took the physical examination but represented herself to be her sister, Victoria Ludwinska, who was confined in an asylum. Victoria died after the two-year contestability period. The trial court found that the incontestability clause barred asserting the impersonation as a defense. The appellate court disagreed: "The difficulty we find with this conclusion is that the court did not go back far enough to ascertain whether there was any contract between Victoria and the insurance company that would permit the operation of the incontestable clause. . . . [¶] In all insurance policies, as in other contracts, there must be some point where the minds of the parties meet in contractual relation [citations] on all its elements before any contract whatever exists." (*Id.* at p. 30.)

The *Ludwinska* court found that the incontestability "clause can rise no higher than the policy; the incontestable clause cannot of itself create the contract. [¶] Here from the pleadings it is conceded that Victoria did not and could not sign the application for insurance. . . . Therefore, a contractual relation between Victoria and the company never existed. . . . [¶] Where one contracts with an individual face to face and intends to contract with the person before him, the contract, if any, is made with that particular person, regardless of what name he may assume for the transaction and regardless of whether the assumed name actually is the name of a living person with whom the other party was under the impression he was contracting. . . . [¶]

. . . [T]here never was a contract concerning the life of Victoria . . . . What the insurance company really did was to insure Bertha, if it insured anyone. The name affixed to the application does not govern unless the name identifies the human being it purports to. . . . Insurance companies do not insure names. They insure lives. The name Victoria was not insured." (*Ludwinska, supra,* 178 A. at pp. 30-31, fn. omitted.)

In a discussion that, although dicta, is particularly significant here, the *Ludwinska* court went on to contrast its facts with facts like those here: "Had Victoria of sound mind signed or authorized Bertha to sign the application, and a policy had subsequently issued to her, then the substitution of Bertha for Victoria in the medical examination would have been an affirmative defense to be proven by the company [i.e., a defense subject to the incontestability clause] . . . ." (*Ludwinska, supra,* 178 A. at p. 31.)

We thus see that the two leading impostor cases involve a person impersonating the named insured both in the application and the examination. Subsequent cases recognizing the impostor defense contained similar facts. (*Petaccio* v. *New York Life Ins. Co.* (1937) 125 Pa.Super. 15 [189 A. 697, 698] ["the defense was that the man whose death was proven was not the person who signed the application for the insurance and presented himself to, and was examined and passed by, defendant's medical examiner"]; *Valant* v. *Metropolitan Life Ins. Co.* (1939) 302 Ill.App. 196 [23 N.E.2d 922, 922-923] ["[t]he defense interposed was that the person who signed the application and submitted to a medical examination was not [the person] named in the policy—that someone had impersonated him"]; *Obartuch* v. *Security Mut. Life Ins. Co.* (7th Cir. 1940) 114 F.2d 873, 875 [named insured either did not sign the insurance application or signed it not knowing its contents or intending to obtain insurance, and another person took the medical examination]; see also *Maxwell* v. *Cumberland Life Ins. Co.* (1987) 113 Idaho 808 [748 P.2d 392, 394] [describing *Ludwinska* and *Obartuch* as cases where "an impostor tried to obtain life insurance as if he were another person"].)

As discussed below, two decisions applying New Jersey law recognized a defense under facts similar to those here, but the law regarding incontestability clauses in New Jersey is very different than in California.

### C. *Application to This Case*

█ The basic rationale of the cases recognizing the impostor defense is that when a person applies for the insurance and takes the medical examination, but uses the name of someone else who then dies, no contract ever

existed insuring the life of the person who has died and whose name is stated in the insurance policy. No California decision has considered this question, but Amex cites *Crump* v. *Northwestern Nat. Life Ins. Co.* (1965) 236 Cal.App.2d 149 [45 Cal.Rptr. 814]. In *Crump*, the insurance company argued that because the named insured did not personally sign the application, "there was never a meeting of the minds as between the insurer and the insured, and that the purported policy was void *ab initio.*" (*Id.* at p. 151.) Although the *Crump* court found a valid contract under its facts, it stated, as relevant here, "Incontestability does not apply to a policy which is void *ab initio.* The invocation of an incontestability provision presupposes a basically valid contract." (*Id.* at p. 157.) As stated in *K.C. Working C. Co.* v. *Eureka-Sec. Ins. Co.* (1947) 82 Cal.App.2d 120, 131 [185 P.2d 832], "To constitute a valid contract of insurance the minds of the parties must have met on the identity of the person with whom they are dealing."

Amex argues it insured, if anyone, the person who appeared for the medical examination, not Morales, and that to the extent the policy purported to insure Morales, it was void from the beginning or, to use the term in the cases, *ab initio.* The incontestability clause, it further argues, does not prevent a claim the policy never insured Morales. In this case, however, there *was* a meeting of the minds on the identity of the person with whom Amex was dealing. Morales, the named insured, personally applied for the insurance. Amex insured his life, not someone else's. Amex did not know that an impostor appeared for the medical examination and, we may assume, would not have insured Morales's life had it known the true facts. But the fraud is similar to other frauds that the incontestability clause clearly covers. If, for example, an applicant falsely claims on the application to be healthy and then appears for the medical examination but somehow substitutes a healthy blood sample for the tainted one, the fraud would be similar in effect to that here, but there could be no question whose life was being insured.

We agree with the Court of Appeal's analysis: "The undisputed facts of this case fit the precise scenario described in *Ludwinska* which would fall outside the impostor defense and within the policy's incontestability provision. Morales himself applied for the insurance, then sent another to take the medical exam in his place. As *Ludwinska* makes clear, the name on Morales's application governs because it identified the human being it purported to. Once Morales actually applied, his use of an impostor for the blood and urine tests did not alter the fact that he and Amex both intended to deal with each other. Instead, his misconduct was grounds for an affirmative defense based on fraud, but did not preclude the existence of mutual assent, which was necessary to invoke the impostor defense. (*Ludwinska, supra,* 317 Pa. at pp. 581-583 [178 A. at pp. 30-32].)" (Fn. omitted.)

Rejecting the impostor defense under these facts furthers the policy behind incontestability clauses. When the named insured applies for the policy, and the premiums are faithfully paid for over two years, the beneficiaries should be assured they will receive the expected benefits, and not a lawsuit, upon the insured's death. The incontestability clause requires the insurer to investigate fraud before it issues the policy or within two years afterwards. The insurer may not accept the premiums for two years and investigate a possible defense only *after* the beneficiaries file a claim. Here, with minimal effort, Amex could have discovered the fraud at the outset, as it did finally from information available before it issued the policy. The person who appeared for the examination did not produce identification although Amex could easily have demanded it. The impostor's height and weight differed considerably from Morales's. The signatures of the applicant and the impostor were transparently different. Amex ignored this information and merely accepted the premiums for the entire period of contestability. Then it became too late to claim for the first time that an impostor took the medical examination. Beneficiaries have the right to expect that after the premiums are paid for the specified time, the insurer will promptly pay the policy proceeds upon the insured's death. The incontestability clause protects that right.

In some cases, to be sure, the fraud will be harder to discover than here. But presumably, it would be no easier to discover fraud two years after the events than at the outset. More importantly, if the fraud is harder to discover, *defending* against a claim of fraud would also be more difficult after years have passed and the named insured—no doubt the key witness—has died. Again, we agree with the Court of Appeal: "[T]he deception could well have been discovered at the start had Amex simply required all applicants to produce photographic identification before conducting a medical exam and issuing a policy. Given the relatively light burden of such a requirement, combined with the burden of diligence which [Insurance Code] section 10113.5 places on the insurer, application of the incontestability clause to bar Amex's challenge is proper. [¶] To hold otherwise might lead to no end of mischief as insurance companies who have taken no steps to verify the identity of their applicants or medical examinees then comb their files after the incontestability period expires, looking for some basis to contend that someone other than the named insured took part in the application or examination process. [¶] Both the courts and the Legislature have recognized the occasional inequity which the incontestability clause may allow. The inequity here was no different. While Morales's fraud was abhorrent, he did nothing more than adopt another means of supplying false information to further his own application. Amex was deceived by this, but always intended to contract with Morales."

Amex cites the language in *Maslin*: "There cannot be the slightest doubt that the person whom an insurance company intends to make a contract with and intends to insure is the person who presents himself for physical examination." (*Maslin, supra,* 3 F.Supp. at p. 370.) But, as the Court of Appeal found, "The *Maslin* court made clear, however, that there was no mutual assent because the insurer never had *any* contractual dealings with the named insured, not simply because an impostor appeared for the medical exam. (*Maslin, supra,* 3 F.Supp. at pp. 369-370.) Elsewhere, the court stated: 'The defendant's only contract was with the man who *made the application and took the examination.*' (*Id.* at p. 370, italics added [by the Court of Appeal].) This is underscored by the decisions relied on by the *Maslin* court, which found their genesis in the rule 'applicable to contracts generally that where a man, pretending to be some one else, goes in person to another and induces him to make a contract, the resulting contract is with the person actually seen and dealt with and not with the person whose name was used. [Citations.]' (*Maslin, supra,* 3 F.Supp. at p. 370.)"

Amex also relies on two federal decisions applying New Jersey law to facts similar to those here. (*Fioretti* v. *Massachusetts General Life Ins. Co.* (11th Cir. 1995) 53 F.3d 1228, affirming *Fioretti* v. *Massachusetts General Life Ins. Co.* (S.D.Fla. 1993) 892 F.Supp. 1492; *Strawbridge* v. *New York Life Ins. Co.* (D.N.J. 1980) 504 F.Supp. 824.) Both cases recognized a defense despite the incontestability clause when an impostor took the medical examination. But, as explained in *Fioretti*, ". . . New Jersey law permits an insurer to rescind [after the period of contestability] even when its insured has committed an innocent misrepresentation . . . ." (*Fioretti* v. *Massachusetts General Life Ins. Co., supra,* 53 F.3d at p. 1237.) As the law in California is quite different (*Dibble, supra,* 170 Cal. 199), we find these cases unpersuasive. Amex also cites language in the district court decision in *Fioretti.* (*Fioretti* v. *Massachusetts General Life Ins. Co., supra,* 892 F.Supp. 1492.) To the extent that opinion is inconsistent with the rationale of the appellate decision affirming it, we find it, too, unpersuasive. The appellate decision made clear that New Jersey law controlled the outcome.

Both sides cite Couch on Insurance, a leading treatise on insurance law, in support of their positions. Slome has the better of it. Amex cites language not quite on point: "A contract based upon a medical examination of one impersonating the insured is void ab initio. [Fn. omitted.] . . . [¶] On the theory that a contract is in fact made with the person dealing *face to face* with the insurer regardless of the name he has assumed in the transaction, it is held that the insurer may assert that it intended to insure the person who appeared for the examination, and not the individual bearing the name appearing in the application, regardless of the presence in the policy of an

incontestability clause." (7 Couch on Insurance (2d ed. 1985) § 37:330, p. 922, fns. citing *Ludwinska, supra*, 178 A. 28, omitted, italics added.) This language does not expressly address the distinction between an impostor who both applies for the insurance and takes the medical examination and an impostor who merely takes the examination. The repeated citations to *Ludwinska* imply the distinction. But what is only implied here is expressed in another volume of the same treatise.

Slome (and the Court of Appeal) cites language directly on point: "There is authority that an incontestable clause does not prevent the insured from showing that the named insured had been impersonated by another *in the application and* upon the medical examination. [¶] If one, or another by his authority, applies for life insurance, *the impersonation of him by another in the medical examination is a matter of defense to which an incontestable clause applies*, but such clause does not preclude an insured from asserting that the individual by whom the application was made in the name of another and who took the medical examination, and not the individual bearing such name, is the one whom it intended to insure." (18 Couch on Insurance (2d ed. 1983) § 72:73, p. 339, fns. omitted, italics added.) This states the critical distinction. Whatever the result when an impostor applies for insurance in the name of another and takes the medical examination, when the named insured applies for the policy, and an impostor only takes the examination, that provides a defense subject to the incontestability clause. But the policy does insure the applicant whose name is on the policy; it is not void from the beginning.

Amex also argues that it can contest the existence of the contract because the medical examination was a condition precedent to its formation. We rejected a similar argument long ago. " ' "The defendant contends . . . that the policies must have had a legal inception in order to sustain an action thereon, and that before the plaintiff could claim the benefit of the incontestable clause she must show that all the conditions precedent to the issuance of the policies have been complied with. To this contention it should be said that the policies were issued and were delivered; that the premiums due upon said policies were received by said defendant up to the time of the death of the insured; that the policies were treated by the insured and the defendant as subsisting contracts between them. The policies upon their face purport an obligation on the part of the defendant. To an action to enforce this apparent obligation the defendant interposes the defense that the insured was not in good health at the time of the delivery of the policies. Upon this ground the defendant is contesting its liability under the policy. *Such a contest is within the scope of that clause which makes the policy incontestable* after one year from its date if all due premiums shall have been

paid, without by its terms excluding any ground of defense. To hold otherwise would be to permit such a clause in its unqualified form to remain in a policy as a deceptive inducement to the insured." ' " (*Dibble, supra,* 170 Cal. at p. 206, original italics.) As Couch on Insurance states, the incontestability clause "protects the insured against any defense of a breach of a condition precedent where he has paid premiums beyond the period of contestability." (18 Couch on Insurance, *supra,* § 72:79, p. 344, fn. omitted.)

We conclude that, after the contestability period has expired, an insurer may not assert the defense that an impostor took the medical examination if, as here, the named insured personally applied for insurance.

### III.   DISPOSITION

The judgment of the Court of Appeal is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Werdegar, J., and Brown, J., concurred.