*126
 
 OPINION OF THE COURT
 

 Rosenblatt, J.
 

 The appeal before us involves a face-off between an incontestability clause and a coverage limitation provision in a disability insurance policy. The question is this: Given a two-year incontestability clause, may a carrier disclaim coverage for a claim made more than two years after issuance of a disability policy, contending that the disabling condition manifested itself before the effective date of the policy?
 

 In April 1991, defendant John Doe submitted an application for disability insurance to plaintiff The New England Mutual Life Insurance Company. In the application, Doe answered “no” to various questions as to whether he had ever been treated for or had any known indication of a variety of medical conditions (none of which are at issue here). Additionally, Doe answered “no” to the questions whether, in the past five years, he had had any other “medical advice or operation, physical exam, treatment, illness, abnormality or injury,” and whether he was “currently receiving any medical advice or treatment.” In fact, Doe had recently been diagnosed HIV positive, and was receiving treatment for that condition. Without knowledge of that information, the carrier issued a disability insurance policy to Doe on April 15, 1991.
 

 Five years later, in March 1996, Doe became disabled due to “HIV and AIDS, Toxoplasmosis” and submitted a claim for benefits to the carrier. The carrier paid benefits to Doe under a reservation of rights, and then commenced this proceeding for a declaratory judgment allowing it to disclaim coverage on the . ground that the sickness from which Doe’s alleged disability arose “did not first manifest itself
 
 after
 
 the date of issue of the
 
 *127
 
 policy” (emphasis added). Supreme Court granted Doe’s motion to dismiss the complaint, and the Appellate Division affirmed, holding that the policy’s incontestability clause precluded the carrier from denying benefits to the policyholder. The Appellate Division ordered that judgment be entered declaring that the carrier pay benefits to Doe under the policy. This Court granted the carrier leave to appeal.
 

 The Insurance Policy
 

 Doe’s policy provided coverage for “sickness or disease which first manifests itself after the Date of Issue” (section 1.6). Two key provisions in the policy bear on this coverage clause: one is a policy exclusion that the carrier chose to include in the policy:
 

 “We will not pay benefits for a Pre-Existing Condition if it was not disclosed on Your application. PreExisting Condition means a sickness or physical condition for which within two years, prior to the Date of Issue [,]
 

 “a. Symptoms existed that would cause an ordinarily prudent person to seek diagnosis, care or treatment; or
 

 “b. Medical advice or treatment was recommended by or received from a Physician” (section 3.2).
 

 The policy, however, also contained a second key provision, an incontestability clause mandated by New York Insurance Law § 3216 (d) (1) (B):
 

 “a. After Your Policy has been in force for 2 years, excluding any time You are disabled, We cannot contest the statements in the application.
 

 “b. No claim for loss incurred or Disability that starts after 2 years from the Date of Issue will be reduced or denied because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue” (section 10.2).
 

 The carrier argues that neither the language of the incontestability clause nor the legislative history behind Insurance Law § 3216 (d) (1) (B) bars it from denying a claim for disability when, as here, the disability is caused by a disease that had manifested itself before the policy was issued and the policy’s coverage provision contains an exclusion for such conditions. We disagree, and we affirm the order of the Appellate Division.
 

 
 *128
 
 Incontestability
 

 The incontestability concept was first introduced in the middle of the nineteenth century in life insurance polices issued by English life insurance companies to assuage concerns by the public that the companies were unjustly avoiding payment on claims
 
 (see,
 
 Greider, Crawford, and Beadles, Law and Insurance Contract, ch 17, at 447-448 [5th ed]). There was widespread belief, and accompanying insecurity on the part of the public, that insurance companies “resisted liability stubbornly on the basis of some misstatement made by the insured at the time of applying for the policy, as to which they carefully refrained from comment until the insured had died and was unable to testify in his own behalf’ (7 Williston, Contracts § 912, at 394 [3d ed]). The remedy was the advent of the incontestability clause, which is something akin to a contractual statute of repose. It limits the period of time that the carrier has to investigate the veracity of the policyholder’s statements, after which it may not contest the policy except on certain stated grounds, usually nonpayment of premiums
 
 (see,
 
 7 Williston, Contracts § 912, at 395-396 [3d ed]).
 

 The incontestability clause initially found its way into the American life insurance policies for similar reasons: to provide policyholders and beneficiaries with security that their premiums were buying the protection that they believed they were paying for. In the words of Justice Oliver Wendell Holmes, “The object of the [incontestability] clause is plain and laudable — to create an absolute assurance of the benefit, as free as may be from any dispute of fact except the fact of death, and as soon as it reasonably can be done”
 
 (Northwestern Mut. Life Ins. Co. v Johnson,
 
 254 US 96, 101-102).
 

 Although insurance companies themselves wrote incontestability clauses into their policies to encourage customers to buy insurance, State legislatures began to require incontestability clauses because of continuing abuses by the companies and to protect the average consumer from the power discrepancy between the carrier and the customer
 
 (see,
 
 Cooper,
 
 Liar’s Poker: The Effect of Incontestability Clauses After Paul Revere Life Insurance Co. v Haas,
 
 1 Conn Ins LJ 225, 228 [1995]). In 1906, following an extensive inquiry into every aspect of the insurance industry, New York became the first State to enact a law (L 1906, ch 326) mandating carriers to put incontestability clauses in their life insurance policies
 
 (see,
 
 Greider, Crawford, and Beadles, Law and Life Insurance Contract,
 
 op. cit.,
 
 at 448).
 
 *129
 
 In 1951 New York required carriers to put incontestability provisions in all accident and sickness policies as well (L 1951, ch 630) (now Insurance Law § 3216 [d] [1] [B]).
 

 The legislative intent behind these incontestability clauses was much the same as in life insurance policies: “ ‘to encourage insurance buyers to purchase insurance with confidence that after the contestable period has passed they are assured of receiving benefits if they are disabled’ ”
 
 (Spear v Guardian Life Ins. Co.,
 
 112 AD2d 904, 906-907, quoting
 
 Fischer v Massachusetts Cas. Ins. Co.,
 
 458 F Supp 939, 944 [SD NY]), as well as to reduce litigation (see,
 
 Wischmeyer v Paul Revere Life Ins. Co.,
 
 725 F Supp 995, 1000 [SD Ind]). By the same token, a con-testability period gave the carrier a specified, reasonable amount of time to investigate statements made by the policyholder in procuring the policy (see,
 
 Simpson v Phoenix Mut. Life Ins. Co.,
 
 24 NY2d 262, 266;
 
 Equitable Life Assur. Socy. v Madis,
 
 240 AD2d 100, 102).
 

 The proliferation of incontestability clauses has generated a sizeable body of decisional law. On a national level', two conflicting lines of authority have emerged. One has it that an incontestability clause does not preclude a carrier from denying benefits where the policyholder knew, before the policy was issued, of any symptom or condition related to the eventual cause of the disability and did not disclose it
 
 (see, e.g., Paul Revere Life Ins. Co. v Haas,
 
 137 NJ 190, 644 A2d 1098;
 
 Massachusetts Cas. Ins. Co. v Forman,
 
 516 F2d 425 [5th Cir] [Fla],
 
 cert denied
 
 424 US 914). The other line of authority, which we adopt, holds that once the incontestability period is over, a carrier may not deny coverage by claiming that the applicant knew (by manifestation) of any symptom or condition related to the eventual cause of the disability
 
 (see, Favata v Paul Revere Life Ins. Co,
 
 254 AD2d 804;
 
 Equitable Life Assur. Socy. v Madis, supra,
 
 240 AD2d, at 102;
 
 Monarch Life Ins. Co. v Brown,
 
 125 AD2d 75;
 
 Mutual Life Ins. Co. v Insurance Commn.,
 
 352 Md 561, 723 A2d 891;
 
 Estate of Doe v Paul Revere Ins. Group,
 
 86 Haw 262, 948 P2d 1103;
 
 Equitable Life Assur. Socy. v Bell,
 
 27 F3d 1274 [7th Cir] [Ind];
 
 Blue Cross & Blue Shield v Sheehan,
 
 215 Ga App 228, 450 SE2d 228).
 

 In the case before us the incontestability clause provides that if a disability begins two years after the policy was issued, a claim will be honored even though the sickness (or condition) “existed” before the date of issuance. Everything hinges on the word “existed.” The carrier contends that “existed” means “existed without manifestation,” which is to say that it existed
 
 *130
 
 without the policyholder’s knowledge. The carrier asserts that the Legislature must have intended it that way, or else the policyholder could wilfully conceal a known condition and eventually collect benefits. In the carrier’s dictionary, “exist” is defined to cover only those instances in which the applicant is innocent of any knowledge of his or her symptoms.
 

 We reject this argument for two reasons. Exist means exist. We will not limit the definition of the word exist, or redefine it, to mean “unmanifested existence.” If something exists, it does not cease to exist merely because someone (in this case the policyholder) knows of it.
 

 Secondly, the carrier’s interpretation is inconsistent with the legislative intent behind the enactment requiring incontestability clauses, and would upend the statutorily required language.
 
 *
 
 “[L]ogically, any disease or condition that manifests itself must, of course, ‘exist’ ”
 
 (Equitable Life Assur. Socy. v Bell, supra,
 
 27 F3d, at 1280;
 
 see also, Monarch Life Ins. Co. v Brown, supra,
 
 125 AD2d, at 80). The term “exist” must subsume the term “manifest,” else the carrier could avoid the statutory thrust by challenging and litigating every claim on the basis that an illness or disease had been manifest before the policy was issued
 
 (see, White v Massachusetts Cas. Ins. Co.,
 
 96 AD2d 732;
 
 see also, Equitable Life Assur. Socy. v Madis, supra,
 
 240 AD2d, at 104). The carrier’s proposed interpretation would undermine the predictability that the statute was designed to engender. For this same reason — that the statutorily required language would be sapped of its effectiveness — the carrier’s argument that its own policy definition of coverage (quoted above) excludes pre-existing conditions must also fail. Carriers may not write definitions that trump provisions required by law.
 

 Fraud
 

 We are not insensitive to the carrier’s concern that the policyholder’s interpretation may encourage fraud. Were we
 
 *131
 
 faced with a choice between fraud and statutory design, a far more difficult case would be presented. It would be difficult for us to conclude that the Legislature knowingly enacted a statute that would encourage fraud. But that is not the case. A carrier may, compatibly with the incontestability clause, protect itself by including a provision in its incontestability clause creating an exception for “fraudulent misstatements” (see, Insurance Law § 3216 [d] [1] [B]; see
 
 also, Berkshire Life Ins. Co. v Weinig,
 
 290 NY 6, 8;
 
 Favata v Paul Revere Life Ins. Co., supra,
 
 254 AD2d 804;
 
 Monarch Life Ins. Co. v Brown, supra,
 
 125 AD2d, at 79;
 
 Equitable Life Assur. Socy. v Bell, supra,
 
 27 F3d, at 1279;
 
 Fischer v Massachusetts Cas. Ins. Co.,
 
 458 F Supp 939, 942 [SD NY]). The carrier here purposely chose not to include a fraud exception and is bound by that choice — a calculation that includes marketing inducements:
 

 “Incontestability clauses are generally ‘included in the policies to affect their saleability.’ Even when such clauses are required by statute, insurance agents undoubtedly point out the clause to potential buyers and explain that coverage may not be denied after a period of time. Thus, it follows that when given the choice between two clauses, an insurance company would choose the clause that would result in increased sales or in some other benefit to the company. If potential fraud was enough of a threat to the insurance company, the company could have chosen the option that offered long-term protection against fraud”
 

 (Cooper,
 
 Liar’s Poker: The Effect of Incontestability Clauses After Paul Revere Life Insurance Co. v Haas,
 
 1 Conn Ins LJ 225, 233-234;
 
 see also, Provident Life & Acc. Ins. Co. v Altman,
 
 795 F Supp 216, 222 [ED Mich] [court noted that insurance carrier’s omission of fraud provision made the policy more marketable];
 
 Plotner v Northwestern Natl. Life Ins. Co.,
 
 48 ND 295, 301, 183 NW 1000, 1003 [court noted that as an inducement to the purchase of insurance, carriers by their agents “no doubt” point out to prospective policyholders the incontestability clause]).
 

 Accordingly, the order of the Appellate Division should be affirmed, with costs.
 

 Chief Judge Kaye and Judges Bellacosa, Smith, Levine, Ciparick and Wesley concur.
 

 Order affirmed, with costs.
 

 *
 

 We note that the carrier’s interpretation is rebutted by the policy itself, in which the carrier has defined the term “pre-existing condition” as “a sickness or physical condition for which within two years, prior to the Date of Issue. a. Symptoms existed that would cause an ordinarily prudent person to seek diagnosis, care, or treatment; or b. Medical advice or treatment was recommended by or received from a Physician.” Thus, by its own terms, the carrier included known — manifested—conditions within those that are considered to be pre-existing.