[No. S073678. June 19, 2000.]

MARK GALANTY, Plaintiff and Appellant, v.
PAUL REVERE LIFE INSURANCE COMPANY, Defendant and
Respondent.

**COUNSEL**

Lambda Legal Defense and Education Fund, Jon W. Davidson, Beatrice Dohrn, Catherine Hanssens; Hedges & Caldwell, Caldwell, Leslie, Newcombe & Pettit and Mary Newcombe for Plaintiff and Appellant.

Bill Lockyer, Attorney General, David S. Chaney and Raymond B. Jue, Deputy Attorneys General, for the Department of Insurance of the State of California as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of Robert K. Scott, Robert K. Scott and D. Scott Mohney for United Policyholders as Amicus Curiae on behalf of Plaintiff and Appellant.

Gianelli & Morris, Robert S. Gianelli and Sherril Nell Babcock for AIDS Project Los Angeles as Amicus Curiae on behalf of Plaintiff and Appellant.

Michelle Malebranche and Melinda Bird for Protection & Advocacy, Inc., as Amicus Curiae on behalf of Plaintiff and Appellant.

Therese M. Stewart; Law Office of Janis E. Eggleston, Janis E. Eggleston; Janet Seldon; Law Offices of Amitai Schwartz and Amitai Schwartz for the Bar Association of San Francisco, the AIDS Legal Referral Panel of the San Francisco Bay Area and the Women's Cancer Resource Center as Amici Curiae on behalf of Plaintiff and Appellant.

Carol Codrington for the Western Law Center for Disability Rights as Amicus Curiae on behalf of Plaintiff and Appellant.

Heller Ehrman White & McAuliffe, Charles B. Rosenberg and Carlyle W. Hall III for Bet Tzedek Legal Services as Amicus Curiae on behalf of Plaintiff and Appellant.

Susan Berke Fogel and Sharmila Lodhia for the California Women's Law Center, the Employment Law Center, the Los Angeles Breast Cancer Early Detection Program, the Wellness Community of San Diego and the Breast Cancer Fund as Amici Curiae on behalf of Plaintiff and Appellant.

Barger & Wolen, Gail E. Cohen and Larry M. Golub for Defendant and Respondent.

Philip E. Stano; Rivkin, Radler & Kremer, Evan H. Krinick, Norman L. Tolle, Michael P. Versichelli and George J. Keller for American Council of Life Insurers as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**WERDEGAR, J.**—We granted review to consider the effect of a standard incontestability clause that the Insurance Code requires policies of disability

insurance to include. (Ins. Code, §§ 10350, 10350.2; except as noted, all further statutory citations are to this code.) The lower courts construed the clause as permitting an insurer to deny coverage for its insured's disability, caused by AIDS (acquired immune deficiency syndrome), because the insured tested positive for antibodies to HIV (human immunodeficiency virus) before the policy was issued. We reverse.

## FACTS AND PROCEDURAL BACKGROUND

This case comes to us from a decision of the Court of Appeal affirming a summary judgment for defendant Paul Revere Life Insurance Company (Paul Revere). Undisputed evidence adduced in connection with the motion reveals the following:

In June 1987, plaintiff Mark Galanty had his blood tested for antibodies to HIV. The result was positive. The lay counselor who reported the result to Galanty told him it could be erroneous, needed to be confirmed, and did not necessarily mean he was infected with HIV or would ever get AIDS. Galanty did not take another test at that time.

Galanty's primary care physician, who also certified Galanty's disability, is Dr. Anthony Scarsella. Although Dr. Scarsella is a family practitioner, the majority of his patients are HIV positive. Dr. Scarsella first saw Galanty in 1987. Galanty's testimony suggests he told Dr. Scarsella he was HIV positive at that time, but Dr. Scarsella does not remember when Galanty first said this. In May 1988, Galanty came to see Dr. Scarsella with flu symptoms. Dr. Scarsella did not at that time diagnose Galanty as having AIDS. Instead, he treated Galanty for influenza.

In the fall of 1988, Galanty applied for a policy of disability insurance at his insurance agent's solicitation. On the later, formal application that became a part of the policy, Galanty answered "no" to the questions whether he had "ever been treated for or had any known indication of . . . [d]isease or disorder of the heart or circulatory system, lungs, kidneys, bladder, genital or reproductive organs, brain or nervous system, skin, eyes, ears or speech" and whether he was "currently receiving any medical advice or treatment." In response to the question whether he had "[i]n the past 5 years . . . had any medical advice or operation, physical exam, treatment, illness, abnormality or injury not listed above," Galanty answered that he had consulted Dr. Anthony Scarsella in connection with "flu." The application did not ask

whether Galanty had tested positive for HIV.[1] Paul Revere issued a disability insurance policy to Galanty on March 17, 1989.

Before issuing the policy, Paul Revere requested and received Galanty's medical records from Dr. Scarsella. The records for Galanty's visit in May 1988 contain the notations "viral syndrome" and "[i]n UCLA double blind study."[2] Paul Revere did not at that time ask Galanty to submit to any tests or examinations or to authorize UCLA to release its research records.

In July of 1989, Dr. Scarsella first tested Galanty's immune system and found it to be functioning normally. The record contains no medical information from that point until 1994. On September 1, 1994, Galanty presented a claim to Paul Revere for benefits for total disability due to AIDS and distal symmetric peripheral neuropathy (DSPN), a neurological condition sometimes associated with AIDS that causes numbness and pain in the extremities. Dr. Scarsella certified the diagnosis of AIDS and DSPN and that Galanty, a court reporter, was no longer able to practice his profession.

Paul Revere initially accepted Galanty's claim and began to pay benefits. Thereafter, the insurer began to investigate. In February 1995, Paul Revere asked Galanty to provide "the exact date and facility" at which he first tested positive for HIV and to authorize UCLA to release its research records. A series of letters ensued, in which Galanty and Paul Revere debated the insurer's entitlement to the requested information and its relevance to coverage. In April 1995, Paul Revere ceased paying benefits. Paul Revere did not, however, formally deny Galanty's claim at that time. Instead, the insurer wrote that Galanty's claim would receive "further attention" upon receipt of the requested information. Galanty then retained an attorney, who disclosed to Paul Revere that Galanty had first tested positive for HIV in 1987. The insurer thereupon formally denied coverage. Explaining its position in a

---

[1] Prior to 1989, Health and Safety Code former section 199.21, subdivision (f) provided: "The results of a blood test to detect antibodies to the probable causative agent of acquired immune deficiency syndrome, which identifies or provides identifying characteristics of the person to whom the test results apply, shall not be used in any instance for the determination of insurability or suitability for employment." (Stats. 1988, ch. 1582, § 1, p. 5731, repealed by Stats. 1995, ch. 415, § 19.) Legislation effective January 1, 1989, however, permitted an insurer to deny an application for insurance based on a positive HIV antibody test confirmed by a second, more reliable test. (Ins. Code, § 799.02, added by Stats. 1988, ch. 1279, § 1, p. 4271; see also Health & Saf. Code, § 120980, subd. (f) [barring the use of HIV test results to determine insurability, except as provided in Ins. Code, § 799.02].)

[2] Dr. Scarsella subsequently explained that the notation "viral syndrome" referred to Galanty's flu symptoms rather than to AIDS and that, while HIV infection can present symptoms similar to flu, he did not at that time associate Galanty's symptoms with HIV or AIDS. The record does not reflect the subject matter of the University of California at Los Angeles (UCLA) study.

letter to Galanty's attorney, Paul Revere wrote that Galanty's "current illness manifested itself prior to the date of issue, and therefore it is not a covered sickness as that term is defined under his policy."

On March 18, 1996, Galanty sued Paul Revere for breach of the insurance contract and on a variety of related tort and statutory claims, including breach of the covenant of good faith and fair dealing. Paul Revere moved for summary judgment on all of Galanty's claims on the grounds that the policy did not cover his disability and that the insurer, accordingly, had breached no legal duty owed to him. Paul Revere based its motion on a provision limiting coverage to disabilities caused by "sickness or disease which first manifests itself after the Date of Issue and while Your Policy is in force" and on a provision excluding coverage for preexisting conditions. Galanty, in opposition, relied on the policy's incontestability clause, which bars the insurer from "reduc[ing] or den[ying] [a claim for benefits] because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue." The superior court granted the motion and entered judgment for Paul Revere. The Court of Appeal affirmed.

## DISCUSSION

The lower courts concluded Paul Revere was entitled to summary judgment because the policy issued to Galanty did not cover his AIDS-related disability. ■ Following the applicable standard, we review the moving papers independently to determine whether there is a triable issue as to any material fact and whether the moving party is entitled to judgment as a matter of law. (See *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 404 [87 Cal.Rptr.2d 453, 981 P.2d 79]; Code Civ. Proc., § 437c.) For the reasons set out below, we conclude the lower courts erred.

■ Any analysis of coverage must begin with the language of the policy. The usual goal of policy interpretation is "to give effect to the mutual intention of the parties," while reading the policy's "language in context with regard to its intended function in the policy." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264, 1265 [10 Cal.Rptr.2d 538, 833 P.2d 545].) The statutory incontestability clause, however, invokes different rules of construction. Language required by statute must be construed to effect not the intent of the parties but the intent of the Legislature. (See *Prudential-LMI Com. Insurance v. Superior Court* (1990) 51 Cal.3d 674, 684 [274 Cal.Rptr. 387, 798 P.2d 1230].) Therefore, the rules of statutory construction apply. (*State Farm Mut. Auto. Ins. Co. v. Messinger* (1991) 232 Cal.App.3d 508, 519 [283 Cal.Rptr. 493]; *Interinsurance Exchange v. Marquez* (1981) 116 Cal.App.3d 652, 656 [172 Cal.Rptr. 263].)

Furthermore, the particular incontestability clause the Legislature has mandated for disability policies (§ 10350.2) takes precedence over other language in the policy. This is a result of sections 10328 and 10390, which appear in the chapter of the Insurance Code governing disability insurance. Under section 10328, policy provisions not required by law, such as definitional provisions, may not "make a policy or any portion thereof less favorable in any respect to the insured or the beneficiary" than the required provisions, such as the incontestability clause. Under section 10390, moreover, "[a] policy delivered or issued for delivery to any person in this State in violation of [the chapter of the Insurance Code governing disability insurance] shall be held valid but shall be construed as provided in this chapter. When any provision in such a policy is in conflict with any provision of this chapter, the rights, duties and obligations of the insurer, the insured and the beneficiary shall be governed by this chapter."

To analyze coverage in this case, we must therefore consider three provisions of the policy. These three provisions (1) define covered "Sickness[es]," (2) define, and exclude coverage for, "Pre-Existing Condition[s]," and (3) bar the insurer from denying benefits for certain preexisting conditions after the policy has been in effect for two years. The first two provisions were drafted by Paul Revere. Only the last provision, the incontestability clause, is required by statute.[3]

In the language of the policy, Paul Revere contracted to pay benefits for "loss due to . . . Sickness," and defined "Sickness" as "sickness or disease

---

[3]Section 10350.2 provides, as relevant here:

"A disability policy shall contain a provision which shall be in one of the two forms set forth herein. Policies other than noncancellable policies shall use Form A. Noncancellable policies shall use either Form A or Form B. In Form B the clause in parentheses in paragraph (a) may be omitted at the insurer's option. Paragraph (a) in Form A shall not be so construed as to affect any legal requirement for avoidance of a policy or denial of a claim during the initial two-year period . . . .

"Form A.

"Time Limit on Certain Defenses: (a) After two years from the date of issue of this policy no misstatements, except fraudulent misstatements, made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such two-year period.

"(b) No claim for loss incurred or disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy.

"Form B.

"Incontestable: (a) After this policy has been in force for a period of two years during the lifetime of the insured (excluding any period during which the insured is disabled), it shall become incontestable as to the statements contained in the application.

"(c) [*sic*] No claim for loss incurred or disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition not excluded from coverage by name or specific

which first manifests itself after the Date of Issue and while Your Policy is in force." Paul Revere excluded coverage for "Pre-Existing Condition[s]" with this language: "We will not pay benefits for a Pre-Existing Condition if it was not disclosed on Your application. Pre-Existing Condition means a sickness or physical condition for which prior to the Date of Issue: [¶] a. Symptoms existed that would cause an ordinarily prudent person to seek diagnosis, care, or treatment; or [¶] b. Medical advice or treatment was recommended by or received from a Physician. [¶] Also We will not pay benefits for any loss We have excluded by name or specific description." Finally, Paul Revere included this version[4] of the statutory incontestability clause (cf. § 10350.2, form B): "a. After Your Policy has been in force for 2 years, excluding any time You are Disabled, We cannot contest the statements in the application. [¶] b. No claim for loss incurred or Disability that starts after 2 years from the Date of Issue will be reduced or denied because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue."

As an examination of the relevant policy language indicates, the provisions defining "Sickness" and "Pre-Existing Condition" appear to conflict with paragraph b of the incontestability clause. The definitional provisions limit coverage to those disabilities caused by "sickness or disease which first manifests itself after the Date of Issue . . . ." The incontestability clause, in contrast, bars the insurer from "reduc[ing] or den[ying] coverage because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue."

The apparent conflict between the definitional provisions and the incontestability clause generated the present dispute. Paul Revere successfully argued below that the policy did not cover Galanty's disability because the causative sickness first manifested itself, within the meaning of the definitional provisions, when Galanty tested positive for antibodies to HIV, about two years before the policy was issued. Paul Revere asserts that Galanty misleadingly failed to disclose the test on his application. The company does

---

description effective on the date of loss had existed prior to the effective date of coverage of this policy." (Fn. omitted.)

The chaptered version of the law mistakenly labeled the second paragraph of form B as paragraph (c); there is no paragraph (b).

[4]Paul Revere's version of the incontestability clause deviates in certain respects from the statutory form. Deviation is permissible, so long as the insurer does not thereby "make a policy or any portion thereof less favorable in any respect to the insured or the beneficiary . . . ." (§ 10328; see also § 10350.) No party has pointed to any relevant difference between the statutory form and the actual policy language.

not, however, seek to rescind the policy for fraud.[5] Instead, Paul Revere defends its denial of coverage as a correct interpretation of the policy that has nothing to do with Galanty's "fraud or lack of fraud in the procurement of his policy . . . ." Galanty, in opposition, argues that the incontestability clause, and its statutory analogue (§ 10350.2, form B), bar Paul Revere from denying coverage. Invoking the language of the clause, Galanty contends that Paul Revere may not deny his claim for disability benefits on the ground that the causative sickness "existed before the Date of Issue," no matter when it first manifested itself, because he did not become disabled until more than two years after the date of issue and because the policy did not exclude the sickness, AIDS, by name or specific description.

The dispositive issue may thus be stated as follows: Assuming for the sake of argument that the sickness causing the insured's disability manifested itself before the policy's date of issue, does the incontestability clause nevertheless bar the insurer from denying coverage after the policy has been in effect two years?[6] Ultimately the question is one of statutory construction: Does section 10350.2 place effective, mandatory limits on an insurer's ability to deny disability benefits on account of a preexisting condition, regardless of when the condition first became manifest?

We have not previously addressed this issue. In the only published opinion on point in this state, the court in *McMackin v. Great American Reserve Ins. Co.* (1971) 22 Cal.App.3d 428, 439-440 [99 Cal.Rptr. 227] decided the issue in the insured's favor, although without useful discussion. Conversely, courts have decided the issue in the insurer's favor in the case before us and in a case granted and held for this case (*Callahan v. Mutual Life Ins. Co.* *(Cal.App.)).[7]

The issue has often arisen in other jurisdictions. Considering only those decisions interpreting functionally identical policy language, the highest

[5]Paul Revere is currently paying benefits to Galanty, under a reservation of rights, for a different disability apparently unconnected with AIDS or DSPN.

[6]Galanty argues in the alternative that his unconfirmed positive test for antibodies to HIV in 1987 did not constitute a manifestation of AIDS within the meaning of the policy. In view of the ground on which we reverse, we do not address the argument.

*Reporter's Note: Review granted on August 11, 1999, S079363. On September 13, 2000, the cause was transferred to Court of Appeal, Second Appellate District, Division Four, with directions. Opinion was filed December 16, 2000, not for publication.

[7]In *United Fidelity Life Ins. Co. v. Emert* (1996) 49 Cal.App.4th 941, 944-947 [57 Cal.Rptr.2d 14], the Court of Appeal interpreted the differently worded incontestability clause in a life and disability insurance policy as barring the insurer from rescinding the policy for fraud. The insured, who was HIV positive, had falsely represented on his application that he had no immune deficiency disorder.

courts of Delaware,[8] Hawaii,[9] Maryland,[10] Minnesota[11] and New York[12] have resolved the question in the insured's favor. Lower state courts, and federal courts applying state law, have done likewise under the laws of Georgia,[13] Indiana,[14] Michigan[15] and Wisconsin.[16] In contrast, the Supreme Court of New Jersey[17] has resolved the question in the insurer's favor. So, too, have lower state and federal courts applying the laws of Arizona,[18] Florida,[19] Massachusetts,[20] Mississippi,[21] Tennessee,[22] and Washington.[23]

---

[8]*Penn Mut. Life Ins. Co. v. Oglesby* (Del. 1997) 695 A.2d 1146, 1149-1152 (answering certified question); see also *Oglesby v. Penn Mut. Life Ins. Co.* (D.Del. 1995) 889 F.Supp. 770, 773-779, affirmed by table disposition (3d Cir. 1997) 127 F.3d 1096.

[9]*Estate of Doe v. Paul Revere Ins. Group* (1997) 86 Hawaii 262 [948 P.2d 1103, 1112-1122, 67 A.L.R.5th 743].

[10]*Mutual Life v. Insurance Comm.* (1999) 352 Md. 561 [723 A.2d 891, 895-898].

[11]*Kersten v. Minnesota Mut. Life Ins. Co.* (Minn. 2000) 608 N.W.2d 869, 872-878.

[12]*New England Mut. Life Ins. Co. v. Doe* (1999) 93 N.Y.2d 122 [688 N.Y.S.2d 459, 710 N.E.2d 1060, 1061-1064]; see also *Monarch Life Ins. Co. v. Brown* (1987) 512 N.Y.S.2d 99, 101-103]; *Rackear v. Springfield Fire & Marine Ins. Co.* (1965) 48 Misc.2d 707 [265 N.Y.S.2d 715, 717-720] (hospitalization policy); *Fisher v. Massachusetts Cas. Ins. Co.* (S.D.N.Y. 1978) 458 F.Supp. 939, 941-945 (applying New York law).

[13]The court in *Brock v. Guaranty Trust Life Ins. Co.* (1985) 175 Ga.App. 275 [333 S.E.2d 158, 160-161], found no coverage for the insured's claim because the policy's definition of "confinement" had not been satisfied. The court found for the insured, however, on the issue presented here. (*Id.* at pp. 159-160.) The federal court in *Keaten v. Paul Revere Life Ins. Co.* (5th Cir. 1981) 648 F.2d 299, 300-304, had erroneously predicted that Georgia's courts would decide the issue for the insurer.

[14]*Equitable Life Assur. Soc. of U.S. v. Bell* (7th Cir. 1994) 27 F.3d 1274, 1277-1283 (applying Indiana law); see *Wischmeyer v. Paul Revere Life Ins. Co.* (S.D.Ind. 1989) 725 F.Supp. 995, 999-1005 (same).

[15]*Equitable Life Assur. Soc. of U.S. v. Poe* (6th Cir. 1998) 143 F.3d 1013, 1017-1020 (applying Michigan law); *Provident Life and Acc. Ins. Co. v. Altman* (E.D.Mich. 1992) 795 F.Supp. 216, 220-223 (same). An unpublished decision to the contrary, *Weiner v. Paul Revere Life Ins. Co.* (E.D.Mich. July 31, 1991, No. 90-72772) 1991 WL 353370, *2-3, was effectively overruled by *Equitable Life Assur. Soc. of U.S. v. Poe.*

[16]*Peterson v. Equitable Life Assurance Society* (W.D.Wis. 1999) 57 F.Supp.2d 692, 700-704.

[17]*Paul Revere Life Ins. Co. v. Haas* (1994) 137 N.J. 190 [644 A.2d 1098, 1103-1104]. In reaching its decision, the high court of New Jersey rejected other courts' contrary conclusions about New Jersey law. (See *Lindsay v. U.S. Life Ins. Co.* (1963) 80 N.J.Super. 465 [194 A.2d 31, 33-35] [major medical insurance policy]; and *Manzella v. Indianapolis Life Ins. Co.* (E.D.Pa. 1993) 814 F.Supp. 428, 430-434 [applying New Jersey law].)

[18]*Button v. Connecticut General Life Ins. Co.* (9th Cir. 1988) 847 F.2d 584, 587-589 (applying Arizona law).

[19]*Allen v. Aetna Life Ins. Co.* (5th Cir. 1977) 563 F.2d 1240, 1241-1242 (applying Florida law to accidental death policy).

[20]*Massachusetts Casualty Insurance Co. v. Forman* (5th Cir. 1975) 516 F.2d 425, 427-431 (applying Massachussetts law).

[21]*Neville v. American Republic Ins. Co.* (5th Cir. 1990) 912 F.2d 813, 814-815 (applying Mississippi law).

[22]*Krakowiak v. Paul Revere Life Ins. Co.* (Tenn.Ct.App. June 7, 1996, No. 01-A-01-9511-CH00541) 1996 WL 303661, *2-7.

[23]*Jack v. Paul Revere Life Ins. Co.* (1999) 97 Wn.App. 314 [982 P.2d 1228, 1230-1235].

To understand why courts have split on this issue, and to evaluate the parties' arguments, some knowledge of the history of the incontestability clause mandated in section 10350.2 is necessary. Incontestability clauses first appeared in life insurance policies in the middle of the 19th century as a feature offered voluntarily by insurers. Such clauses were intended to promote the sale of policies to a public generally distrustful of insurers, and to address the perception that insurers tended to avoid paying benefits because of minor misstatements in applications for insurance. Although one state required life insurance policies to contain incontestability clauses as early as 1873, such laws did not appear on a wide scale until this century. Their principal motivation appears to have been the work of the Armstrong Commission, which in 1906 investigated charges of corruption, fraud and dishonesty in the insurance industry in New York. Later that year, a national conference of governors, attorneys general and insurance commissioners formed a Committee on Uniform Legislation, which drafted a model life insurance policy containing an incontestability clause. Many states passed statutes requiring incontestability clauses based on that model. That model, in turn, became the basis of a model incontestability clause statute drafted by the National Association of Insurance Commissioners (NAIC) in 1946 and subsequently adopted by many states. (See generally Note, *AIDS and the Incontestability Clause* (1990) 66 N.D. L.Rev. 267, 268-270.)

Incontestability clauses written to conform to statutes based on the 1906 and 1946 models generated much litigation. The function of the clause remained unsettled for many years. "The only generally accepted certainty was that the incontestability clause was clearly meant to remove fraud as a defense after the passage of two years." (Note, *AIDS and the Incontestability Clause, supra,* 66 N.D. L. Rev. at p. 272.) Such a clause typically provided, without much elaboration, that a policy was "incontestable after it [had] been in force during the lifetime of the insured for two years" except, in some instances, for nonpayment of premiums or military service in time of war. While life insurance policies frequently did (and still do) include coverage for disability, the insurer was typically permitted to exclude disability benefits from the scope of the incontestability clause. The standard clause's rather general language led to conflict over the scope of incontestability: Did a clause declaring the policy "incontestable" after two years simply bar the insurer from challenging the policy's validity, or did it bar the insurer from asserting all defenses not expressly preserved in the incontestability clause?

A few courts took the position that an incontestability clause barred all defenses by the insurer, including the defense that a claim was not covered. In *Jordon v. Western States Life Ins. Co.* (1952) 78 N.D. 902 [53 N.W.2d

860], for example, the Supreme Court of North Dakota held that a statutorily required clause making a life insurance policy "incontestable after two years from the date of issue" barred the insurer from denying a claim for death caused by air travel, even though the policy expressly excluded death by air travel as a covered risk. In the court's view, "writers of standard form policies must, by statutory mandate, bind themselves, when two years have elapsed after the issuance of a policy of life insurance, to pay the full amount stated in the principal insuring clause thereof upon proof of the fact of death alone, unless of course the premiums have not been paid or the provisions relating to military and naval service have been violated." (53 N.W.2d at p. 864.) The court rejected, as contrary to the statutory mandate, the insurer's effort to modify the incontestability clause to exclude air travel. (*Id.* at pp. 863-866.)

In contrast, the majority of courts concluded that an incontestability clause did not bar the insurer from asserting the defense of lack of coverage. The seminal decision is *Metropolitan Life Ins. Co. v. Conway* (1930) 252 N.Y. 449 [169 N.E. 642]. In that case, the New York Superintendent of Insurance had refused an insurer's request for permission to include in its life insurance policies a rider excluding coverage for travel by aircraft. In the superintendent's view, the rider was inconsistent with the state's statute requiring all policies of life insurance to include a standard incontestability clause. In other words, the superintendent interpreted the incontestability clause as barring the insurer from raising all defenses not expressly preserved in that clause. The court, in an opinion written by Chief Judge Cardozo, disagreed. In the court's view, "the rider and the statute . . . [were] consistent and harmonious. The provision that a policy shall be incontestable after it has been in force during the lifetime of the insured for a period of two years is not a mandate as to coverage, a definition of the hazards to be borne by the insurer. It means only this, that within the limits of the coverage the policy shall stand, unaffected by any defense that it was invalid in its inception, or thereafter became invalid by reason of a condition broken." (169 N.E. at p. 642.)

The decision in *Metropolitan Life Ins. Co. v. Conway, supra,* 169 N.E. 642 was very influential. In 1947, insurance industry associations formed the so-called Holland Committee, which promulgated a new model incontestability-clause statute embodying the holding of *Conway.* The new model clause expressly resolved the conflict between coverage and incontestability, in these words: "A clause in any policy of life insurance providing that such policy shall be incontestable after a specified period shall preclude only a contest of the validity of the policy, and shall not preclude the assertion at any time of defenses based upon provisions in the policy which exclude or

restrict coverage, whether or not such restrictions are excepted in such clause." (Note, *AIDS and the Incontestability Clause, supra,* 66 N.D. L. Rev. at p. 276.) Many states, including California, subsequently adopted incontestability clause statutes influenced by *Conway* and the Holland Committee's model statute. Section 10113.5, which sets out the incontestability clause required in life insurance policies delivered in this state, expressly provides that the clause "shall not be construed to preclude at any time the assertion of defenses based upon policy provisions that exclude or restrict coverage." (*Id.,* subd. (c); see Note, *AIDS and the Incontestability Clause, supra,* 66 N.D. L. Rev. at pp. 275-276.)

The incontestability clause required in disability policies has very different language than the clause required in life insurance policies, and additional history. Section 10350.2, which governs disability policies, was based on the Uniform Individual Accident and Sickness Policy Provisions Law promulgated by the NAIC in 1950. Section 10350.2 was enacted in California the next year at the recommendation of the state's Insurance Commissioner, who had served on the NAIC committee responsible for the uniform law.[24] (See *John Hancock Mut. Life Ins. Co. v. Greer* (1998) 60 Cal.App.4th 877, 882 [71 Cal.Rptr.2d 48].)

Section 10350.2 offers a choice of two forms, labeled A and B, to insurers writing noncancellable policies of disability insurance, such as the policy Paul Revere issued to Galanty. The first paragraph of each form addresses challenges to the validity of the policy, but differs depending on the form. Form A expressly permits the insurer to defend claims based on fraudulent misstatements by the insured, in these words: "After two years from the date of issue of this policy no misstatements, *except fraudulent misstatements,* made by the applicant in the application for such policy shall be used to void the policy or to deny a claim for loss incurred or disability (as defined in the policy) commencing after the expiration of such two-year period." (§ 10350.2, form A, par. (a), italics added.) Form A thus offers insurers greater protection against fraud by insureds than the incontestability clause

---

[24]Amicus curiae AIDS Project Los Angeles asks us to take judicial notice of Insurance Commissioner Maloney's 1951 letter to Governor Warren recommending approval of Assembly Bill No. 524 (1951 Reg. Sess.) (Stats. 1951, ch. 570, § 11, pp. 1724-1725), which reflected the NAIC uniform law, and other materials from the Governor's files, including additional letters recommending approval of the bill, executive branch memoranda reflecting the Insurance Commissioner's participation in the NAIC, and Assembly Bill No. 524 itself. The motion is granted. (See Cal. Law Revision Com. com., 29B West's Ann. Evid. Code (1995 ed.) foll. § 450, p. 420 ["Under the Evidence Code, as under existing law, courts may consider whatever materials are appropriate in construing statutes, determining constitutional issues, and formulating rules of law. That a court may consider legislative history . . . , materials that . . . indicate contemporary opinion, and similar materials is inherent in the requirement that it take judicial notice of the law."].)

required in life insurance policies. The latter does not permit the insurer, in most cases,[25] to challenge the policy or its own liability on account of fraudulent statements by the insured in the application for insurance after the period of contestability has run. (See generally *Amex Life Assurance Co. v. Superior Court, supra,* 14 Cal.4th 1231.)

Paul Revere chose not to use form A. Instead, the insurer used form B, which does not permit challenges to the validity of the policy based on fraudulent misstatements after the period of contestability has run. Form B, in its first paragraph, provides: "After this policy has been in force for a period of two years during the lifetime of the insured (excluding any period during which the insured is disabled), it shall become incontestable as to the statements contained in the application." (§ 10350.2, form B, par. (a).) The choice of form B over form A has been described as "a calculation that includes marketing inducements . . . ." (*New England Mut. Life Ins. Co. v. Doe, supra,* 710 N.E.2d at p. 1064; see also *Equitable Life Assur. Soc. of U.S. v. Bell, supra,* 27 F.3d at p. 1279.) In other words, by choosing form B an insurer gives up, after two years, the right to assert the defense of fraud in order to make the policy more attractive to consumers and, thus, more saleable.[26] During the two-year period of contestability, however, the insurer may investigate the insured's statements in the application, and the policy remains subject to rescission for fraud.

The second paragraph of each form set out in section 10350.2 is identical. This paragraph, which contains the language that primarily concerns us, addresses denials of coverage based on preexisting conditions (as opposed to claims for recission, which the first paragraph addresses). The second paragraph provides: "No claim for loss incurred or disability (as defined in the policy) commencing after two years from the date of issue of this policy shall be reduced or denied on the ground that a disease or physical condition

---

[25]Following the decision in *Amex Life Assurance Co. v. Superior Court* (1997) 14 Cal.4th 1231 [60 Cal.Rptr.2d 898, 930 P.2d 1264], the Legislature amended sections 10113.5 and 10206 to declare "void from its inception" "any purported insurance contract" "if photographic identification is presented during the application process, and if an impostor is substituted for a named insured in any part of the application process . . . ." (Stats. 1998, ch. 184, § 1.)

[26]" 'Incontestability clauses are generally "included in the policies to affect their saleability." Even when such clauses are required by statute, insurance agents undoubtedly point out the clause to potential buyers and explain that coverage may not be denied after a period of time. Thus, it follows that when given the choice between two clauses, an insurance company would choose the clause that would result in increased sales or in some other benefit to the company. If potential fraud was enough of a threat to the insurance company, the company could have chosen the option that offered long-term protection against fraud.' " (*New England Mut. Life Ins. Co. v. Doe, supra,* 710 N.E.2d at p. 1064, quoting Note, *Liar's Poker: The Effect of Incontestability Clauses After Paul Revere Life Insurance Co. v. Haas* (1995) 1 Conn. Ins. L.J. 225, 233-234.)

not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy." (§ 10350.2, form A, par. (b); *id.*, form B, par. (c).)

This language differs radically from the language of the incontestability clause required in life insurance policies. The life insurance incontestability clause, as noted, expressly permits "the assertion of defenses based upon policy provisions that exclude or restrict coverage." (§ 10113.5, subd. (c); see *ante*, at p. 381.) In contrast, the disability insurance incontestability clause expressly affects coverage by disallowing the defense "that a disease or physical condition not excluded from coverage by name or specific description effective on the date of loss had existed prior to the effective date of coverage of this policy." (§ 10350.2, form A, par. (b); *id.*, form B, par. (c).) Explanatory comments prepared by the NAIC described this aspect of the model law as "introduc[ing] a new principle in accident and sickness insurance by guarantying to the insured that, after the policy has been in force for three years,[27] no claim will be denied on the basis of misstatements in the application or on the contention that any infirmity existed prior to the date of issue of the policy." (NAIC, Explanatory Comments on the Uniform Individual Accident and Sickness Policy Provisions Law Adopted in June 1950, p. 3 (hereafter NAIC, Explanatory Comments).) The NAIC also described the provision as effecting "[t]he surrender by the insurer, after three years, of the right to base a defense upon a misstatement in the application or upon prior origin of any condition." (*Ibid.*)

This background illuminates the parties' arguments. Paul Revere contends it has no obligation, despite the incontestability clause, to pay benefits for Galanty's disability (AIDS and DSPN) because the causative sickness first manifested itself, in the form of a positive HIV test, before the policy was issued. Paul Revere thus seeks to harmonize the policy provisions defining the scope of coverage with the incontestability clause. Galanty, in opposition, argues that Paul Revere may not deny a claim for disability benefits, no matter when the causative sickness first existed, so long as he did not become disabled until more than two years after the policy's date of issue. Galanty would, thus, find a conflict between the coverage provisions and the incontestability clause, and resolve the conflict by giving priority to the latter.

---

[27]The Legislature reduced the period of contestability to two years in 1993, as part of the Health Insurance Access and Equity Act. (Stats. 1993, ch. 1210, § 7, p. 6946.) The same act contained a variety of provisions intended to protect access to insurance for persons with HIV. The act also prohibited "postclaims underwriting," defined as "the rescinding, canceling, or limiting of a policy or certificate due to the insurer's failure to complete medical underwriting and resolve all reasonable questions arising from written information submitted on or with an application before issuing the policy or certificate." (§ 10384.)

Paul Revere begins its argument by assuming that incontestability clauses do not affect coverage and that the Legislature, in adopting section 10350.2, shared that assumption. That an incontestability clause does not affect coverage is, as we have seen, the prevailing interpretation of the standard clause contained in many life insurance policies. (See *Metropolitan Life Ins. Co. v. Conway, supra,* 169 N.E. at pp. 642-644, and the discussion, *ante,* at p. 380 et seq.) The assumption is consistent, Paul Revere notes, with the general principle that "an insurer has a right to limit the policy coverage in plain and understandable language, and is at liberty to limit the character and extent of the risk it undertakes to assume . . . ." (*VTN Consolidated, Inc. v. Northbrook Ins. Co.* (1979) 92 Cal.App.3d 888, 892 [155 Cal.Rptr. 172]; see also *Merril & Seeley, Inc. v. Admiral Ins. Co.* (1990) 225 Cal.App.3d 624, 630 [275 Cal.Rptr. 280].) If we accept these premises (to continue Paul Revere's argument), we must construe the incontestability clause to be consistent with the clauses defining coverage. This might be accomplished by construing the incontestability clause as if it included the following italicized words: "No claim for loss incurred or Disability that starts after 2 years from the Date of Issue will be reduced or denied because a sickness or physical condition not excluded by name or specific description before the date of loss had existed" *but not manifested itself* "before the Date of Issue." Read in this way, the clauses defining coverage would not conflict with the incontestability clause because the former would create coverage only for a disability caused by a "sickness or disease which first manifests itself after the Date of Issue . . . ." The net effect of such a construction would be to guarantee coverage for an insured who had no reason to suspect sickness (i.e., had an unmanifested sickness) at the time he or she applied for insurance, but not for an insured who had, in the words of the clause defining preexisting conditions, "symptoms . . . that would [have] cause[d] an ordinarily prudent person to seek diagnosis, care, or treatment" (i.e., had a manifested sickness). This argument was first articulated, and accepted, in *Massachusetts Casualty Insurance Co. v. Forman, supra,* 516 F.2d 425, 428-430. Most of the courts that have decided the present issue in the insurer's favor have relied on *Forman.* (See *ante,* at pp. 378-379, fns. 17-23.)

Paul Revere's argument has serious flaws, beginning with the assumption on which it depends. In the present context, the assumption that an incontestability clause cannot affect coverage is erroneous. The assumption, as noted, finds its origin in Chief Judge Cardozo's explanation that an incontestability clause "is not a mandate as to coverage, a definition of the hazards to be borne by the insurer. [The clause] means only this, that within the limits of the coverage the policy shall stand, unaffected by any defense that it was invalid in its inception, or thereafter became invalid by reason of a condition broken." (*Metropolitan Life Ins. Co. v. Conway, supra,* 169 N.E. at

p. 642.) This explanation makes perfect sense in its original context: a conflict between an incontestability clause in a life insurance policy, providing simply that the policy "shall be incontestable" after two years, and a provision excluding coverage for a specific hazard, namely, travel by aircraft. (*Ibid.*) But the proposition that no incontestability clause, regardless of wording, can ever affect coverage has no logical force in the present context of a statutorily required (§ 10350.2) clause that expressly bars the insurer, after two years, from denying coverage "because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue."

Nor does California law support Paul Revere's position. To be sure, the courts of this state have frequently stated that incontestability clauses do not affect coverage. No court, however, has relied on that proposition to permit an insurer to assert a defense specifically prohibited by the language of an incontestability clause.[28]

In *New York Life Ins. Co. v. Hollender* (1951) 38 Cal.2d 73 [237 P.2d 510], this court held that an incontestability clause in a life and disability insurance policy did not preclude the insurer from adjusting disability benefits to reflect the insured's true age, rather than the false age stated on the application. The court quoted and relied on Chief Judge Cardozo's statement to the effect that an incontestability clause " 'is not a mandate as to coverage . . . .' " (*Id.* at p. 79, quoting from *Metropolitan Life Ins. Co. v. Conway*, *supra*, 169 N.E. at p. 642.) The policy in question, however, expressly authorized the insurer to adjust benefits for the insured's true age, in these words: " 'If the age of the insured has been misstated, the amount payable hereunder shall be such as the premium paid would have purchased at the correct age.' " (*New York Life Ins. Co. v. Hollender, supra*, 38 Cal.2d at p. 76.) Furthermore, the policy's incontestability clause expressly excluded disability benefits from its scope. (*Ibid.*) Most importantly, the incontestability clause was not the clause required by section 10350.2, but the different clause typically required at that time in life insurance policies. (*Hollender*, at p. 76.)

The decisions in *John Hancock etc. Ins. Co. v. Markowitz* (1944) 62 Cal.App.2d 388 [144 P.2d 899] (*Markowitz*) and *Cohen v. Metropolitan Life Ins. Co.* (1939) 32 Cal.App.2d 337 [89 P.2d 732] (*Cohen*) are similar. In each case, the Court of Appeal permitted the insurer under a policy of life and disability insurance to disclaim coverage for the insured's disability, despite the standard life insurance incontestability clause, because the causative sickness predated the policy. The court in *Markowitz* reasoned that "an

---

[28]Except, of course, in the decision on review and in the case granted and held for this case (see *ante*, at p. 377).

incontestab[ility] clause does not operate to extend the coverage of a policy to a disease contracted before the issuance of the policy." (*Markowitz, supra,* 62 Cal.App.2d at p. 397.) Likewise, the court in *Cohen* observed that "[a]n incontestab[ility] clause in an insurance policy does not extend the coverage beyond the terms of the policy. Therefore, it does not relieve the insured . . . from the burden of proving that the disease from which he is suffering originated and occurred after the issuance of the policies . . . ." (*Cohen, supra,* 32 Cal.App.2d at p. 346.) Both courts relied on *Apter v. Home Life Ins. Co. of New York* (1935) 266 N.Y. 333 [194 N.E. 846, 848, 98 A.L.R. 1281], which in turn relied on Chief Judge Cardozo's explanation in *Metropolitan Life Ins. Co. v. Conway, supra,* 169 N.E. at page 642. (See *ante,* at p. 384.) Unlike the incontestability clause required by section 10350.2, however, the clauses construed in *Markowitz* and *Cohen* did not purport to bar the insurer from denying a claim "because a sickness or physical condition not excluded by name or specific description before the date of loss had existed before the Date of Issue." Instead, the clauses at issue in those cases provided in relevant terms simply that the policies "shall be incontestable" after they had been in force for the requisite period of time, except for nonpayment of premiums. (*Markowitz, supra,* 62 Cal.App.2d at pp. 395-396; *Cohen, supra,* 32 Cal.App.2d at p. 341.) The incontestability clause construed in *Cohen,* moreover, expressly excluded disability benefits from its scope. (*Cohen, supra,* at p. 341.) These decisions, in short, do not support the insurer's position.

The next flaw in Paul Revere's argument is that it depends upon an unexpected and inobvious, if not unnatural, definition of the term "existed." The insurer would construe the incontestability clause as barring the insurer from denying coverage for a sickness that *existed* before the policy *without manifestation,* but not for a sickness that *manifested* itself before the policy was issued. "Existed" would, thus, mean "existed without manifestation."

The argument is not convincing. In saying that something exists, one does not normally entertain unarticulated mental reservations about manifestation. Certainly the Legislature might have used the term in this way, if it had labored under the belief that an incontestability clause, by its very nature, could not affect coverage. But there is no good reason to attribute such a belief to the Legislature. As already noted, the NAIC model statute the Legislature adopted as section 10350.2, form B, was understood by its drafters, including the Insurance Commissioner who urged the law's adoption, as "introduc[ing] a new principle in accident and sickness insurance by guarantying [*sic*] to the insured that, after the policy has been in force for three years, no claim will be denied on the basis of misstatements in the application or on the contention that any infirmity existed prior to the date of

issue of the policy." (NAIC, Explanatory Comments, *supra*, at p. 2; see also *ante*, at p. 381, fn. 24.) Form B thus represented a clean break from the line of authority beginning with *Metropolitan Life Ins. Co. v. Conway*, *supra*, 169 N.E. 642, in which Chief Judge Cardozo had interpreted the incontestability clause typically found in life insurance policies as preserving the defense of lack of coverage. (See *ante*, at p. 380 et seq.) It is, moreover, hard to imagine a clearer statement of intent to bar denials of coverage for preexisting conditions than to require coverage even of those conditions concealed from the insurer by misstatements in the application. (See § 10350.2, form B.)

For these reasons, to recognize a conflict between the statutory incontestability clause on one hand, and the policy's definitional and coverage provisions on the other, is unavoidable. The former bars the insurer from denying coverage "because a sickness or physical condition . . . had existed before the Date of Issue." The latter purport to limit coverage to disabilities caused by "sickness or disease which first manifests itself after the Date of Issue," and to exclude coverage for preexisting conditions that were "not disclosed on [the] application." Having acknowledged the conflict, the resolution is clear: Policy language required by the Insurance Code takes precedence over other policy language. The code does not permit provisions written by the insurer, such as the provisions in Paul Revere's policy defining sicknesses and preexisting conditions, to "make a policy or any portion thereof less favorable in any respect to the insured . . . than the [statutory] provisions" (§ 10328), such as the incontestability clause. Moreover, when any nonrequired policy provision, such as a definitional provision, "is in conflict" with any required provision, such as the incontestability clause, "the rights, duties and obligations of the insurer [and] the insured . . . shall be governed by" the required provisions. (§ 10390.) In short, the incontestability clause controls.

These statutory provisions, contrary to Paul Revere's argument, do not destroy an insurer's liberty to limit the character and extent of the risk it undertakes to assume. Paul Revere was free, before issuing its policy to Galanty, to examine his medical condition and to exclude any preexisting condition "by name or specific description" in the policy. (§ 10350.2, form B, par. (c).) The statutory incontestability clause permits and respects such exclusions. (*Ibid.*) Moreover, if Paul Revere in drafting its policy had perceived a conflict between the incontestability clause and the scope of coverage it wished to provide, the company could have asked the Insurance Commissioner for permission to modify the incontestability clause.

(§ 10323.)[29] Other courts have found, in an insurer's failure to request a modification of the statutory incontestability clause, apparently sufficient reason to reject the argument that policy provisions defining sicknesses and preexisting conditions nullify the incontestability clause. (E.g., *New England Mut. Life Ins. Co. v. Doe, supra,* 710 N.E.2d at pp. 1063-1064; *Penn Mut. Life Ins. Co. v. Oglesby, supra,* 695 A.2d at pp. 1150-1151; *Estate of Doe v. Paul Revere Ins. Group, supra,* 948 P.2d at p. 1116, fn. 22; *Equitable Life Assur. Soc. of U.S. v. Bell, supra,* 27 F.3d at pp. 1282-1283.)

Paul Revere, as mentioned at the outset, does not assert that Galanty's fraud, or lack of fraud, in the procurement of his policy is determinative. It is nevertheless appropriate, however, to address the argument that enforcing the statutory incontestability clause as written will reward dishonest applicants for disability insurance and place an undue burden on insurers to cover undisclosed risks. We recently rejected the same argument. ■ An incontestability clause "does not condone fraud but merely establishes a time limit within which it must be raised." (*Amex Life Assurance Co. v. Superior Court, supra,* 14 Cal.4th at p. 1237.) Incontestability clauses thus function as " ' "statute[s] of limitations upon the right to maintain certain actions or certain defenses . . . ." ' " (*Ibid.*) Such clauses reflect the legislative policy judgment that it is reasonable and proper to give the insured " ' " 'a guaranty against possible expensive litigation to defeat his claim after the lapse of many years' " ' " while, at the same time, " ' " 'giv[ing] the company time and opportunity for investigation, to ascertain whether the contract should remain in force.' " ' " (*Id.* at p. 1238.)

In the particular context of disability insurance, the Legislature has given insurers the following protections against fraud: The insurer may use a form of incontestability clause that expressly preserves its right to void the policy and to deny claims based on fraudulent misstatements at any time. (§ 10350.2, form A.) Moreover, if the insurer chooses to use the other form of incontestability clause (*id.,* form B), the insurer still has two years after issuing the policy to investigate the insured's medical condition and statements in the application. Only an insurer, like Paul Revere in the case before us, that chooses to forgo both contractual protection against fraud and timely verification of the insured's medical condition runs the risk of having to pay a claim that may turn out to be related to a sickness that first manifested

---

[29]Section 10323 provides: "If any provision set forth in Article 4a or 5a of this chapter [governing disability insurance] is in whole or in part inapplicable to or inconsistent with the coverage provided by a particular form of policy the insurer, with the approval of the commissioner, shall omit from such policy any inapplicable provision or part of a provision, and shall modify any inconsistent provision or part of the provision in such manner as to make the provision as contained in the policy consistent with the coverage provided by the policy."

itself before the policy's inception date. Under these circumstances, there is nothing unfair in the Legislature's evident policy judgment that any risk of fraud is outweighed, after the period of contestability has run, by the need to protect the value of the policy to the insured and to reduce litigation. (*Amex Life Assurance Co. v. Superior Court, supra,* 14 Cal.4th at p. 1231.) " ' " "To hold otherwise would be to permit such a clause in its unqualified form to remain in a policy as a deceptive inducement to the insured.' " ' " (*Id.* at p. 1246, quoting *Dibble v. Reliance Life Ins. Co.* (1915) 170 Cal. 199, 206 [149 P. 171].)

█ In conclusion, the incontestability clause bars Paul Revere from denying coverage for Galanty's disability, whether or not the causative sickness first manifested itself before the policy's date of issue. In holding to the contrary, the lower courts erred. The summary judgment for Paul Revere must therefore be reversed.

Despite this conclusion, Paul Revere argues we should nevertheless affirm the judgment in its favor on Galanty's claims for bad faith and emotional distress. The superior court did not separately consider these claims. Instead, it reasoned that all of Galanty's remaining claims necessarily lacked merit because Paul Revere's denial of coverage was lawful and reasonable. The Court of Appeal, which affirmed, also did not address these claims. Accordingly, without intimating any view on the merits, it is appropriate to direct the Court of Appeal to consider the remaining claims on remand.

### DISPOSITION

The judgment of the Court of Appeal is reversed and the case remanded to that court for further proceedings.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.